# Exhibit A

# REDACTED
# IN ITS ENTIRETY

# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INVISTA NORTH AMERICA S.À R.L., | |
| Plaintiffs, | |
| v. | C. A. No. 11-1007-SLR |
| M&G USA CORPORATION and M&G POLYMERS USA, LLC, | |
| Defendants. | |

## DECLARATION OF FRANK D. PETERREINS

I, Frank D. Peterreins, under penalty of perjury, declare as follows:

1.        I am an attorney in the Munich, Germany office of the law firm Fish & Richardson P.C., managing principal of Fish & Richardson's Munich office, and counsel for INVISTA Technologies S.à r.l. in Europe, including in the matter captioned *Invista Technologies S.à r.l. v. Mossi & Ghisolfi s.p.a. et al*, in the District Court of Dusseldorf, Germany (the "German litigation").  I am one of a few attorneys in Germany who have three bar admissions, namely as European patent attorney, German patent attorney and German attorney-at-law, and have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2.



The EP '630 patent is the patent at issue in the German infringement litigation.

3.

In the German litigation, the M&G defendants allege that PoliProtect JB/APB do not contain an ionic compatibilizer.

4.     In accordance with this Court's ruling that INVISTA's German counsel may have access to materials designated Confidential and Highly Confidential under the Protective Order in the INVISTA U.S. litigation, I have signed an acknowledgement to the Protective Order entered in that case.  I am familiar with the provisions of that Protective Order.

5.     Further, in accordance with this Court's ruling that INVISTA could disclose and use in the German litigation certain documents produced by M&G in the USA, I am familiar with the following M&G documents, which INVISTA was permitted to disclose to the Court in Germany: MG00055554, MG00059685, MG00186125, MG000083171, MG00190325, MG00196910, MG00197124, MG00067089, MG00175780, MG00185851, MG00192510, and MG00244354.

6.      MG00055554, MG00059685, MG00186125, MG000083171, and MG00190325

███████████████████████████████████████████████████████████████

7.      MG00196910, MG00197124, MG00067089, MG00175780, MG00185851,

MG00192510, and MG00244354 ████████████████████████████████████

████████████████████████

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 21st day of February, 2013, at Munich, Germany.

_____

Frank D. Peterreins

# Exhibit C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INVISTA S.A.R.L.          )
                          )
          Plaintiff,      )
                          )  C.A. No. 11-1007-SLR-CJB
v.                        )
                          )
M&G USA CORPORATION,      )
et al.,                   )
                          )
          Defendants.     )

Tuesday, June 5, 2012
2:02 p.m.
Teleconference in Chambers

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
         United States District Court Magistrate Judge

APPEARANCES:

         FISH & RICHARDSON, P.C.
         BY:  WILLIAM J. MARSDEN, JR., ESQ.
         BY:  MARTINA TYREUS HUFNAL, ESQ.
         BY:  MICHELLE NEROZZI-ANKENBRAND, ESQ.

                Counsel for the Plaintiffs

         POTTER ANDERSON & CORROON, LLP
         BY:  DAVID E. MOORE, ESQ.

                   -and-

         THOMPSON HINE, LLP
         BY:  MEGAN D. DORTENZO, ESQ.
         BY:  MICHAEL P. SHERBAN, ESQ.
         BY:  CHRISTOPHER M. COMISKEY, ESQ.

                Counsel for Defendant M&G

         Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
                302-658-6697

---

2

1   APPEARANCES CONTINUED:

2

3       SHAW KELLER, LLP
        BY:  JEFFREY T. CASTELLANO, ESQ.

4            -and-

5       KIRKLAND & ELLIS
        BY:  REED S. OSLAN, ESQ.

6

7              Counsel for Defendant Auriga

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
11:01:06
11:01:06  24

---

3

11:01:16   1        THE COURT:  Good morning, everyone.
11:01:17   2   This is Judge Burke.
11:01:18   3        Could the parties let me know who's
11:01:19   4   on the line first for INVISTA?
11:01:22   5        MR. MARSDEN:  Good morning, Your
11:01:23   6   Honor.  It's William Marsden from Fish &
11:01:23   7   Richardson.
11:01:26   8        And I have with me, Martina Hufnal
11:01:28   9   and Michelle Nerozzi-Ankenbrand.
11:01:31  10        THE COURT:  Okay.  Good morning to
11:01:32  11   all of you.
11:01:34  12        And who's on the line for M&G?
11:01:36  13        MS. DORTENZO:  Yes, good morning.
11:01:37  14   This is Megan Dortenzo of Thompson Hine.
11:01:40  15        And with me I have Mike Sherban and
11:01:42  16   Chris Comiskey.
11:01:44  17        MR. MOORE:  And David Moore is on,
11:01:46  18   Your Honor, as well at Potter Anderson.
11:01:49  19        THE COURT:  Okay.  Thanks to all of
11:01:52  20   you.
11:01:52  21        And who's on for Auriga?
11:01:54  22        MR. CASTELLANO:  This is Jeff
11:01:56  23   Castellano from Shaw Keller.  And on the line is
11:01:59  24   Reed Oslan from Kirkland & Ellis.

---

4

11:02:03   1        THE COURT:  All right.  Good morning
11:02:04   2   to you as well.
11:02:05   3        Thanks to everyone for being here on
11:02:06   4   the call.  We're on the record here.
11:02:09   5        And for the record, this is the
11:02:10   6   matter of INVISTA S.a.r.l. vs. M&G USA
11:02:17   7   Corporation, et al.  It's Civil Action Number
11:02:18   8   11-1007-SLR-CJB here in our Court.
11:02:25   9        And we're here today for a
11:02:27  10   teleconference to resolve a number of
11:02:30  11   discovery-related disputes relating to the
11:02:33  12   proposed Protective Order in this case.
11:02:35  13        Since we're on the record, I have a
11:02:37  14   court reporter with us from Hawkins Reporting
11:02:39  15   Service.  And I'd ask the parties, just as they
11:02:42  16   have initially in our call, to identify
11:02:44  17   themselves by name before they speak so we can
11:02:46  18   make sure that we get a good record.
11:02:48  19        So, counsel, I know that I've
11:02:53  20   reviewed the letters that all three parties have
11:02:56  21   submitted regarding these disputes and the
11:02:59  22   proposed Protective Order at issue.  The way I
11:03:04  23   understand it, there are three basic kind of
11:03:07  24   categories of disputes.

---

1 One is the issue as to access to
2 confidential materials by Fish & Richardson's
3 German counsel.
4 The second relates to the scope of
5 the prosecution bar at issue and some of the
6 subsections of the order.
7 And third relates to whether access
8 to designated confidential material should be
9 available to certain in-house business
10 representatives of M&G and Auriga.
11 Those are the three basic big
12 categories of dispute that I gathered. And I
13 guess my first question to counsel is: Are all
14 three of those disputes still live and still need
15 to be addressed?
16 MR. MARSDEN: Your Honor, this is
17 William Marsden. I believe they are all still
18 live.
19 THE COURT: Okay. Well, I think it
20 probably makes sense to take up each of them in
21 the way that they were designated in the letters.
22 Why don't we start with the issue of
23 access to confidential information by Fish &
24 Richardson's German counsel counterparts and

6

1 start there. And then we'll take the others in
2 turn.
3 What I propose to do is allow some
4 additional brief argument by each of the parties
5 who have a position on the issue and then I'll
6 ask a couple of questions of each.
7 I know that Auriga is not taking a
8 position with respect to this issue, but why
9 don't we start with Invista's counsel who's going
10 to speak for INVISTA on the call.
11 MR. MARSDEN: Your Honor, this is
12 William Marsden. I'm speaking to the issues.
13 THE COURT: Okay. Mr. Marsden, is
14 there any additional argument you'd like to make
15 in addition to what you made in your brief?
16 MR. MARSDEN: Your Honor, I don't
17 believe so. I think we have cited multiple cases
18 and authorities.
19 This is well recognized and
20 permissible because of the efficiencies that it
21 would help us realize in the case. The lawyers
22 involved would sign up under that and agree to be
23 bound by the jurisdiction of this Court and by
24 the Protective Order.

1 And we have a further provision that
2 is agreed upon in 4C for a process we have to go
3 through before disclosing the information in any
4 of the German proceedings. And they would have
5 an opportunity to object.
6 So for all those reasons, we think
7 our colleagues in our Munich office should be
8 permitted access.
9 THE COURT: Could you explain in
10 some more detail why, to the extent that
11 defendants would say, Look, you know, there are
12 concerns with respect to confidential
13 information, and Fish & Richardson can still
14 coordinate strategy and share ideas in a
15 meaningful way, just not with respect to certain
16 types of categories and of confidential
17 information.
18 Why isn't the ability to coordinate
19 strategy and share ideas sufficient without the
20 documents, without the use of being able to share
21 the info in these particular documents in a way
22 that it would be enhanced if you have --
23 MR. MARSDEN: Well, I'll address it
24 in two ways. One, Your Honor, our colleagues in

8

1 Munich are highly specialized lawyers with
2 technical training that is highly relevant to the
3 proceedings in Germany, including the opposition
4 proceeding that was initiated by M & G.
5 An opposition proceeding, Your
6 Honor, if you haven't been exposed to those yet,
7 is essentially a challenge to the validity of the
8 German patent, which is the counterpart to the
9 '159 patent that's at issue here.
10 And our colleagues in Munich are
11 highly knowledgeable, not only about the process
12 and procedure there, but also about the relevant
13 technical subject matter, and therefore, can have
14 significant input there.
15 I think the second answer I think in
16 terms of why it shouldn't be a concern to them
17 is, and this will -- this is parallel to an
18 argument you'll hear later with respect to
19 prosecution bar in an opposition proceeding. We
20 cannot broaden the claims.
21 So the risk that prosecution bars
22 are generally written towards, which is the risk
23 that confidential information will be used to
24 write new claims that are broadened and read more

cleanly on a competitor's product is not present
in that opposition proceeding.  And that's
another reason we think the risk -- the
efficiencies are obvious.  Their importance to us
in terms of a coordinated strategy, I think,
should be clear from their expertise and, of
course, they're bound by the Protective Order.
And they cannot write broader claims in this
proceeding, in any event.

THE COURT:  If M&G had asked for the
ability to share the same type of confidential
information with its counterpart attorneys on the
other side of Fish & Richardson over in the
German litigation, I guess Hoffman Eitle is the
name of the firm, would you have objected to
that?

In other words, is there something
specific about the fact that, you know, as you
note in your letter, this is the same firm that
makes a difference in this analysis.

MR. MARSDEN:  Well, there's -- I'm
trying to think through the scenario here, Your
Honor.  To the extent, there is no claim of
infringement against us in Europe of a Auriga

---

purpose -- it couldn't be shared for the purpose
of use in that German litigation.  Documents
couldn't be put into evidence absent the, you
know, further Court order or agreement of the
parties pursuant to 4C.  It would only be for
purposes of getting their advisor counsel as to
this litigation.

Am I right?

MR. MARSDEN:  You're correct, that
it could not be used in the German litigation
without going through the procedures in 4C.  And
we really thought that was going the extra mile
in terms of giving them the protection that they
would need.

If they think it's misuse or not
relevant to the European proceeding, they would
have an opportunity to object.

THE COURT:  Okay.  Who's going to
speak for M&G on this issue?

MS. DORTENZO:  I am, Your Honor.
Megan Dortenzo.

THE COURT:  Okay.  Ms. Dortenzo, let
me give you a chance to add any additional
argument to what you submitted in your papers.

---

patent, so -- I'm sorry, of an M&G patent, so our
confidential information really wouldn't be
relevant.

I suppose if you're asking if there
were an opposition proceeding in Europe, which
there isn't, with respect to an M&G patent, and
there were produced or information produced here
that might be relevant to that proceeding and
another law firm was involved, I guess we don't
have that fact scenario.

But we might not object under those
circumstances.  But this is not an entirely
parallel situation.  Our confidential information
in this litigation is not relevant to the
proceedings in Europe.

THE COURT:  Okay.  I understand.  I
understand what you're saying.

All right.  And to be clear, you
would say because of the limitations already
provided in Section 4 of the draft Protective
Order, you'd say, Look, to the extent that this
certain confidential information could be shared
under our proposal with our colleagues in
Germany, it would only be shared for the

---

MS. DORTENZO:  Thank you, Your
Honor.  And yes, there's a few things that I
would like to address.

First, I think after listening to
counsel, that solidifies our position that it's a
fishing expedition on behalf of INVISTA.  There
is a history of litigation between these two
parties and there is a different, I believe, it's
a nullification, not an opposition proceeding in
Europe on one of the M&G patents.  And it's in
the patent family that is at issue here in the
United States.

And I'm sorry to say, I don't
remember if INVISTA is the initiating party.  But
there is this ongoing -- these ongoing
proceedings with both sets of patents in this
case.

The other thing is that Hoffman
Eitle.  It's pronounced Eitle, Your Honor.

THE COURT:  Okay.

MS. DORTENZO:  Hoffman Eitle, the
German law firm, is representing M&G in the
opposition proceeding of the INVISTA patent.  So
to the extent that there's going to be, you know,

---

13

11:11:01  1    a common ground here if the Court decides to
11:11:04  2    allow this disclosure, I think it would be
11:11:06  3    warranted for Hoffman Eitle to receive all the
11:11:09  4    designated materials from INVISTA because, for
11:11:13  5    the same reason Fish & Richardson is representing
11:11:16  6    INVISTA in the opposition proceeding, Hoffman
11:11:18  7    Eitle is representing M&G, not only in the patent
11:11:21  8    litigation in Germany, but also the opposition
11:11:23  9    proceeding.  So it would be a fair trade, if you
11:11:27  10   will.
11:11:27  11           That being said, we still feel that
11:11:30  12   the disclosure --
11:11:34  13           THE COURT:  Hello?  Can the parties
11:11:37  14   hear me?
11:11:46  15           This is Judge Burke.  Can the
11:11:47  16   parties hear me?  Hello, everyone?
11:11:47  17           (Due to technical difficulties, a
11:11:55  18   brief recess was taken.)
11:14:48  19           THE COURT:  Hi.  This is Judge
11:14:49  20   Burke.
11:14:52  21           MR. MARSDEN:  Sorry, Judge Burke.
11:14:53  22   This is Mr. Marsden.
11:14:55  23           I think you dropped off at some
11:14:57  24   point and I'm not sure when.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

15

11:15:54  1    of view, that the German lawyers of Hoffman Eitle
11:15:58  2    get free access to INVISTA's designated
11:16:01  3    materials, just like the German lawyers of Fish &
11:16:03  4    Richardson have free access.
11:16:05  5            THE COURT:  Can I just clarify?  I'm
11:16:07  6    thinking of this as there are two proceedings
11:16:09  7    going on in Germany.
11:16:10  8            One is there is what I'm thinking of
11:16:12  9    as a kind of a parallel piece of patent
11:16:15  10   litigation in a German Court that involves
11:16:20  11   INVISTA and M&G subsidiaries.  And then
11:16:23  12   separately there is an opposition proceeding in a
11:16:26  13   German tribunal that relates to the patent or the
11:16:32  14   foreign counterpart of the patent in which
11:16:34  15   Hoffman Eitle is representing the M&G entities.
11:16:37  16   Am I right?
11:16:38  17           MS. DORTENZO:  Yes, Your Honor.  But
11:16:39  18   Hoffman Eitle also represents M&G in the German
11:16:43  19   litigation.
11:16:43  20           THE COURT:  Okay.  Got it.
11:16:45  21           MS. DORTENZO:  There's also one
11:16:46  22   other proceeding, but I am remiss at remembering
11:16:49  23   whether this is involved or not.  But there is
11:16:51  24   another proceeding in front of the European

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

14

11:14:59  1            THE COURT:  We just literally lost
11:15:00  2    you Ms. Dortenzo.  I did not hang up on you, I
11:15:02  3    promise.
11:15:03  4            We lost you right when you were
11:15:05  5    transitioning, I think, to German discovery
11:15:10  6    rules.  And when that happened, we just lost you.
11:15:14  7    So we can pick up from there.
11:15:16  8            MS. DORTENZO:  Thank you.  I'm not
11:15:19  9    sure I followed my notes in order, Your Honor, so
11:15:21  10   bear with me.
11:15:22  11           If I repeat myself, I apologize.
11:15:23  12           THE COURT:  That's perfectly all
11:15:25  13   right.
11:15:25  14           MS. DORTENZO:  But just to recap,
11:15:27  15   just to make sure everything is out on the table,
11:15:30  16   I did start off by saying that Hoffman Eitle, the
11:15:33  17   German law firm, is representing M&G in the
11:15:36  18   opposition proceeding of the INVISTA patent.
11:15:39  19           So to the extent that the Court
11:15:41  20   decides disclosure to Germany is warranted, in
11:15:45  21   our mind, Hoffman Eitle would be sitting in the
11:15:48  22   position of the German lawyers at Fish &
11:15:51  23   Richardson.
11:15:52  24           So it would be fair, from our point

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

16

11:16:55  1    Patent Office on a counterpart on an M&G patent
11:16:58  2    as well.
11:16:59  3            THE COURT:  Okay.  All right.
11:17:02  4            All right.  And then, in particular,
11:17:04  5    I think you were transitioning then to talk about
11:17:08  6    kind of the German system, if I'm not mistaken.
11:17:12  7            MS. DORTENZO:  Yes.  It's our
11:17:14  8    understanding, and I believe as set forth and
11:17:17  9    acknowledged by the 7th Circuit, the German
11:17:17  10   litigation proceeding has very strict discovery
11:17:22  11   rules.  They might have a broader policy as
11:17:27  12   pointed out by INVISTA; however, they implemented
11:17:30  13   very strict discovery rules.
11:17:32  14           They don't have mechanisms for
11:17:35  15   interrogatories, or document requests or requests
11:17:37  16   for admissions.  They just don't have that.
11:17:40  17           So it is our position that the
11:17:43  18   unrestricted access to M&G designated materials
11:17:47  19   by INVISTA's German counsel would allow them to,
11:17:52  20   you know, use those materials for strategy and
11:17:56  21   planning purposes, possibly other litigations or
11:18:00  22   proceedings because of the contentious nature
11:18:04  23   between these parties.
11:18:05  24           Paragraph 4, I think this is also

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

**17**

1 where I was transitioning, but Paragraph 4
2 provides a mechanism in place, which is a
3 safeguard. It gives INVISTA what they need,
4 which is a method for using documents over in
5 Germany. But they have to provide the purpose,
6 tell us what it is and why they're using it.
7 And if we have objections, we would
8 try to work those out. Or if not, it would come,
9 unfortunately, I think, back to Your Honor to
10 sort out.
11 But that safeguard in place, in our
12 point of view, addresses everything where they
13 can -- as Your Honor pointed out in the
14 beginning, they can still confer with their
15 German counsel. They just don't have access.
16 German counsel just would not have
17 access to the actual documents and, you know,
18 other discovery responses unless it's actually
19 necessary. And then there's a vehicle in place
20 to introduce it.
21 So it seems apparent to us, this is
22 a fishing expedition where INVISTA wants to use
23 this mechanism to get a broader scope or a
24 broader knowledge base of M&G that otherwise

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

**19**

1 I think in -- I guess discussing it here, there
2 is no prohibition that I know of. That doesn't
3 mean it's not out there, but it's -- I'm looking
4 at it from the point of view that these are two
5 United States lawsuits.
6 You know, we're talking about the
7 first one here, but two United States lawsuits
8 where the United States discovery rules and
9 regulations. And it just seems to us, given the
10 nature between these parties, that the
11 unrestricted access of sending them over to
12 Germany, you know, gives them access that they
13 otherwise wouldn't have.
14 I mean, if it was a different law
15 firm and not Fish & Richardson over in Germany,
16 you know, the interesting thing is would INVISTA
17 be making the same request? I don't know.
18 But that's why, in the alternative,
19 we do have Hoffman Eitle that sits in the same
20 position as the German office of Fish &
21 Richardson with representing them, M&G, in both
22 litigation and the opposition.
23 So, in that regard, right now
24 they've been cut off as well. Remember, we have

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

**18**

1 would be prohibited in Germany.
2 THE COURT: And another question I
3 had is: You know, for example with respect to
4 the 7th circuit case that you cited, I understand
5 your point that German discovery rules are more
6 limited than the rules here in the United States.
7 But is it the case -- I didn't hear
8 you say or read you to say that it was the case
9 that a German Court in the parallel litigation
10 has specifically ruled that Fish & Richardson's
11 counsel shouldn't have access to particular
12 documents.
13 In other words, there's not
14 necessarily some particularized group of
15 documents that a German Court has expressed real
16 reservations about Fish & Richardson having.
17 You're relying more on the general differences
18 between what is generally obtainable in German
19 discovery versus U.S. discovery; is that right?
20 MS. DORTENZO: Correct. I am.
21 I do not have a case that you're
22 asking about from German courts. I probably
23 couldn't read it any way.
24 But that being said, you're right.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

**20**

1 not produced anything or told them anything, you
2 know, about what's going on here other than the
3 general nature of it or what's in the public.
4 But you're right, we're just worried
5 about, you know, circumventing what they
6 otherwise wouldn't be allowed to get.
7 THE COURT: Okay. All right.
8 Mr. Marsden, any additional
9 rebuttal?
10 MR. MARSDEN: Just very quickly to
11 make the point I think I made earlier, which is
12 in Germany the proceedings are different.
13 There's two actions.
14 One action is the opposition
15 proceeding. The only issue there is the validity
16 of our counterpart patent to the '159.
17 Our confidential information is not
18 relevant to that action, and therefore, not
19 needed by their counterpart German counsel.
20 THE COURT: Right.
21 MR. MARSDEN: With respect to the
22 litigation on our patents in Europe, what is
23 issued there is infringement only by their
24 products. So, again, our confidential

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

21

11:22:06 1 information about our product, what's relevant to
11:22:08 2 the U.S. litigation, is not relevant to that
11:22:10 3 litigation and therefore, not needed by their
11:22:12 4 counterpart German counsel.
11:22:13 5      So it's just not a parallel
11:22:15 6 situation and there's no hardship to them in not
11:22:17 7 having access.
11:22:19 8      MS. DORTENZO:  May I address that,
11:22:20 9 Your Honor?
11:22:20 10      THE COURT:  Sure.
11:22:21 11      MS. DORTENZO:  Thank you.  Just real
11:22:22 12 briefly, the debate, as I understand it from the
11:22:25 13 public documents going in, the opposition has to
11:22:28 14 deal with the technology and whether there's some
11:22:31 15 synergistic effect to seek between some of the
11:22:35 16 components of the technology.
11:22:36 17      The specification is the same
11:22:37 18 because they stem from the same parent.  The
11:22:39 19 claims are different.
11:22:41 20      That being said, in the patented
11:22:43 21 issue, there are, I believe, 57 runs of the
11:22:48 22 resin.  And there are different data collected
11:22:51 23 and shown in tables.  I believe there's, you
11:22:54 24 know, 13 or so tables in the patent spec.

22

11:22:57 1      So all of the underlying data
11:22:59 2 regarding those test runs and the measurements
11:23:03 3 taken on those test runs are highly relevant in
11:23:06 4 this U.S. litigation as well as that opposition.
11:23:09 5      And so, you know, I disagree with
11:23:13 6 counsel for INVISTA, because that information
11:23:16 7 which we have asked for in the U.S. litigation
11:23:20 8 and some of which we received, some we have not.
11:23:23 9      But, to the extent they're there, it
11:23:26 10 is labeled Highly Confidential Attorneys' Eyes
11:23:29 11 Only.  And that information is directly relevant
11:23:32 12 to the technology.
11:23:34 13      And the argument that INVISTA has
11:23:35 14 made and appears to still be making in that
11:23:38 15 opposition proceeding in front of European Patent
11:23:41 16 Office --
11:23:41 17      THE COURT:  And again, though,
11:23:43 18 whatever information was shared, if INVISTA gets
11:23:46 19 its way with respect to this issue, it can't be
11:23:50 20 used directly in any way in the German
11:23:53 21 litigation.  Again, we're talking about
11:23:55 22 protecting against kind of the, you know, some kind of bleed
11:24:00 23 amorphous nature of, you know, some kind of bleed
11:24:04 24 into the strategy of counsel over there versus

23

11:24:08 1 based on what they would obtain from this
11:24:10 2 information, not any particularized use in those
11:24:13 3 proceedings; right, Ms. Dortenzo?
11:24:15 4      MS. DORTENZO:  Correct.  However, I
11:24:17 5 would argue that when you get technical data,
11:24:19 6 that could lead someone, you know, for strategy
11:24:23 7 purposes to go one way or the other, Paragraph 4
11:24:25 8 would certainly protect if M&G decided to use any
11:24:30 9 on confidential or designated information from
11:24:33 10 INVISTA in European proceedings.
11:24:34 11      We would follow the procedures set
11:24:36 12 forth in Paragraph 4, you know, asking to use
11:24:39 13 those and then proceed accordingly.  But that
11:24:42 14 being said, you know, one can argue by looking at
11:24:46 15 the technical data, you know, that can help
11:24:49 16 further thought, just like INVISTA looking at
11:24:52 17 data from M&G.  It can spur, you know, other
11:24:56 18 thought on how to proceed whether it's being
11:24:59 19 actually used in a proceeding or not.
11:25:01 20      THE COURT:  And last question.  I
11:25:02 21 hear you disagreeing with Mr. Marsden's view that
11:25:04 22 there is no way in which that the sharing of
11:25:07 23 confidential information with Hoffman Eitle, in
11:25:10 24 either one or both of the proceedings in Germany,

24

11:25:14 1 could be of use in the same kind of way that
11:25:19 2 Fish & Richardson is seeking to share information
11:25:22 3 with the German counsel.
11:25:24 4      Right?  You disagree with his view
11:25:25 5 that it's apples and oranges?
11:25:28 6      MS. DORTENZO:  I absolutely disagree
11:25:29 7 with that.  Also, one other reason is, well,
11:25:32 8 because the opposition standard is one reason.
11:25:34 9      But even with respect to the
11:25:35 10 litigation, but the little I know of German
11:25:38 11 litigation is they do bifurcate the infringement
11:25:41 12 from invalidity.  So, you know, that information
11:25:43 13 would certainly be helpful in any other
11:25:47 14 invalidity -- not invalidity, through the EPO.
11:25:50 15      But invalidity with respect to the
11:25:52 16 patent litigation, you know, argument for the
11:25:55 17 same reasons.
11:25:56 18      THE COURT:  Okay.  And Mr. Marsden,
11:25:58 19 last question to you.
11:25:58 20      To the extent that -- and it's hard
11:26:00 21 for me to tell because I just don't have a lot of
11:26:03 22 information about the German proceedings.  And
11:26:05 23 even if I did, it might still be hard for me to
11:26:07 24 tell.

25

11:26:07 1 To the extent that the defense
11:26:08 2 disagrees with you and they say, No, look, there
11:26:11 3 may well be some synergy shared with our
11:26:13 4 counterpart counsel, Hoffman Eitle in sharing the
11:26:16 5 same kind of information with them that Fish is
11:26:17 6 talking about sharing with the German
11:26:21 7 counterpart. An sod we'd like to be able to do
11:26:22 8 that.
11:26:24 9 I hear you saying you just don't
11:26:25 10 think there is such relevant information. But to
11:26:29 11 the extent they disagree and wanted to be able to
11:26:32 12 do that and have parity, would you be objecting
11:26:34 13 to that?
11:26:34 14 MR. MARSDEN: Well, if I understood
11:26:38 15 the relevance or the argument, we might be open
11:26:40 16 to considering that. But their representations
11:26:44 17 and characterizations being made in the
11:26:46 18 opposition proceeding that have not been made to
11:26:48 19 us in our meet and confer leading up to this
11:26:51 20 call. So we haven't had a chance to confer with
11:26:53 21 our Munich counterparts to assess whether the
11:26:56 22 arguments they made here are consistent with the
11:26:59 23 arguments that have been made in the opposition
11:27:00 24 proceedings.

26

11:27:01 1 But, you know, to the extent there
11:27:03 2 were a basis on which information produced here
11:27:07 3 is, in fact, relevant and could be used in the
11:27:11 4 proceedings in Germany with appropriate
11:27:13 5 safeguards, we would certainly meet and confer
11:27:15 6 about that and would recognize that some
11:27:20 7 reciprocity might be appropriate.
11:27:21 8 But because of the scope of the
11:27:22 9 proceedings, that's not our understanding
11:27:24 10 currently. And we would expect any overlap to be
11:27:27 11 minimal, if any.
11:27:30 12
11:27:31 13 THE COURT: Okay. Well, first, let
11:27:33 14 me give you a decision on this issue.
11:27:35 15 And again, to the extent we're
11:27:37 16 talking about use in Germany, that really isn't
11:27:41 17 pursuant to the Protective Order. It's not
11:27:44 18 actually used in these proceedings.
11:27:45 19 It's simply discussing the -- you
11:27:48 20 know, being able to discuss and share the
11:27:49 21 information with counterpart counsel. And so I
11:27:54 22 want to make that distinction clear.
11:27:55 23 But let me give you my decision as
11:27:57 24 to this issue and then we can move on to the

27

11:28:01 1 second issue at play.
11:28:03 2 So when I look at this issue first,
11:28:06 3 I need to look to Rule 26C of the Federal Rules
11:28:11 4 of Civil Procedure, which as best I know,
11:28:15 5 provides for that the party seeking a Protective
11:28:17 6 Order has to demonstrate good cause for the
11:28:19 7 issuance of that portion of the order.
11:28:23 8 And Rule 26(c)permits a Court to
11:28:25 9 limit or forbid disclosure of certain documents
11:28:28 10 if a showing of good cause is made. And that
11:28:30 11 showing has to be made.
11:28:31 12 So, with some specificity as set
11:28:33 13 forth in the case law cited by the plaintiffs,
11:28:37 14 including in the Johnson vs. Geico Casualty
11:28:40 15 Company case from this district and here, to the
11:28:42 16 extent it's M&G who seeks a further restriction
11:28:45 17 on the disclosure of confidential information, in
11:28:49 18 Section 5(a)1 of the draft Protective Order, that
11:28:52 19 the material not be shared with foreign offices
11:28:54 20 or partners or associates of U.S. counsel, Fish &
11:28:58 21 Richardson's firm.
11:28:59 22 It's M&G who would bear the burden
11:29:01 23 to describe for me why this information could not
11:29:06 24 be shared pursuant to the other terms in the

28

11:29:09 1 Protective Order with Fish & Richardson's German
11:29:11 2 counterparts. And I don't believe that M&G's met
11:29:14 3 that burden here for a few reasons.
11:29:17 4 First, I would note that the
11:29:20 5 potential for the use, as we've talked about
11:29:22 6 already, of any confidential information by Fish
11:29:25 7 & Richardson's German counsel in the German
11:29:28 8 proceedings is severely cabined. It's limited
11:29:31 9 due to Section 4 of the Protective Order, which
11:29:34 10 requires that the materials only be used for
11:29:36 11 purposes of this litigation.
11:29:38 12 And it states that the information
11:29:40 13 can't be used in other matters, including the
11:29:43 14 German proceedings that we've been talking about,
11:29:45 15 absent agreement, as called for, in Section 4C of
11:29:50 16 the draft Protective Order or by separate order
11:29:52 17 of the Court.
11:29:53 18 So I do think that those paragraphs
11:29:55 19 in Section 4 do blunt the impact that any
11:29:59 20 disclosure of confidential information to Fish &
11:30:02 21 Richardson's German counterparts could have with
11:30:04 22 respect to these cases. And I have to take that
11:30:07 23 into account, to some degree.
11:30:09 24 I'd also note that to the extent

29

1  that INVISTA cited a few cases or both sides

2  cited a few cases in their papers relating to 28

3  U.S.C. Section 1782, a statute that deals with

4  the ability to obtain in U.S. courts documents or

5  other information that is to be used in a foreign

6  litigation.

7        I take those cases into account.  I

8  understand that the Supreme Court's decision in

9  the Intel Corp. case that was cited by INVISTA as

10  being relevant here, at least to the degree that

11  the Supreme Court, albeit with respect to a

12  particular statute, which is not at play here.

13        But that they rejected the idea that

14  just because certain types of document are

15  presumably available in discovery in a foreign

16  Court, that that should mean that a U.S. Court

17  should bar their access here in the United

18  States.

19        It at least allows for discretion of

20  courts here to determine, both in Section 1782

21  proceedings and otherwise as to whether or not

22  such documents could be obtained, regardless of

23  whether they're obtainable vis-a-vis foreign

24  discovery laws.  I'd also note that the 7th

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

31

1  counterparts from having access to specified

2  information, and if it looked like they were

3  trying to do so as an end run around that

4  particularized order by way of the Protective

5  Order in this case, that might be a different

6  kettle of fish.

7        But that's not my understanding of

8  the circumstances here.  It's just a more

9  generalized concern that M&G has expressed about

10  the differences in discovery laws and access to

11  information.

12        And so in light of that and in light

13  of the fact that the Protective Order really

14  cabins the way that this protective -- this

15  confidential information can be utilized in the

16  German cases, meaning that it can't be utilized

17  directly, I find M&G hasn't met its burden to

18  show that the more provacative proposal they're

19  seeking is warranted.

20        And so INVISTA's proposal on this

21  point, the sharing of the confidential

22  information at issue with the outside counsel's

23  partners with Fish & Richardson's partners,

24  associates and employees, either in the U.S. or

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

30

1  Circuit that was cited by M&G, although that's

2  the Heraeus Kulzer case, if I'm pronouncing that

3  correctly, although it noted differences between

4  the German legal system and how their discovery

5  rules are more restrictive.  The Court case

6  actually permitted obtaining of documents in U.S.

7  litigation and to do so in a way that I think

8  it's relevant here.

9        It said in that case there wasn't

10  any particularized showing that a German Court or

11  German tribunal had said that the documents would

12  be inappropriate in the German case or that

13  particularized showing that certain information

14  or documents have been offensive in some way to

15  the German Court.

16        And I think that's relevant here in

17  that, you know, M&G doesn't have a particularized

18  set of documents or information that a German

19  Court has called out and said Fish & Richardson's

20  counsel in Germany should not have or should not

21  absolutely be able to know about.

22        If there were such a case, if it was

23  a case where the German Court had simply

24  prohibited Fish & Richardson's German

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

32

1  otherwise, should be a part of the Protective

2  Order absent further joint agreement of the

3  parties to the contrary.

4        As to the issue as to whether

5  Hoffman Eitle should receive parity, I'm not

6  prepared to take up that issue.  I'd suggest that

7  the parties discuss it.

8        I think Mr. Marsden makes a fair

9  point that because it wasn't specifically

10  implicated in the discovery letters here, it's

11  something that really should be the subject of

12  further discussion between the parties.

13        I'm not going to rule on that issue

14  specifically.  As of now, I'll ask the parties to

15  consult with each other about that issue.

16        I would say that I would want to

17  hear some argument from the plaintiffs as to why

18  some amount of parity wouldn't make sense if this

19  case -- if this issue were going to come back to

20  me by way of another discovery dispute about the

21  Protective Order.  But for now, that's my ruling

22  with respect to this first of the three issues.

23        As to the second issue regarding the

24  prosecution bar, here I think all three sides

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

33

11:34:12  1  have views that they would want to share.
11:34:15  2       Why don't I first ask INVISTA if it
11:34:18  3  has anything to add to the arguments it made in
11:34:23  4  its papers regarding the prosecution bar issue?
11:34:25  5       MR. MARSDEN:  Your Honor, very
11:34:27  6  little.  I think we've covered this in our letter
11:34:30  7  brief.
11:34:31  8       You know, all the parties agree that
11:34:32  9  some bar is appropriate.  Really there are two
11:34:36  10  disputes, as I understand it.
11:34:37  11       One is whether it should extend to
11:34:40  12  all prosecution activities and we have made the
11:34:44  13  distinction and a distinction that was recognized
11:34:47  14  by Judge Thynge in the Xerox opinion that we cite
11:34:50  15  that it should only apply to prosecution
11:34:52  16  activities where it would be possible to broaden
11:34:55  17  claims.
11:34:57  18       As Your Honor is probably already
11:34:59  19  aware, there's an increasing amount of interplay
11:35:02  20  between a patent litigation in District Courts
11:35:04  21  and challenges to patents in the Patent Office
11:35:08  22  for re-examination that is about to become even
11:35:11  23  more frequent in light of the American Invent
11:35:14  24  Act, which provides a number of other mechanisms

34

11:35:16  1  for parties to challenge validity in the Patent
11:35:19  2  Office.
11:35:19  3       We think it's important, as a policy
11:35:21  4  matter and for efficiency, that that not be
11:35:26  5  distorted into an inefficient procedure where new
11:35:30  6  counsel need to be involved each time there's
11:35:32  7  such a challenge in the Patent Office.
11:35:33  8       In our view, as Judge Thynge
11:35:35  9  recognized in Xerox, the focus should be whether
11:35:38  10  or not there's potential misuse of confidential
11:35:40  11  information to obtain broader claims than are
11:35:42  12  otherwise available or issued.  And that's the
11:35:47  13  distinction we would draw, the second.
11:35:48  14       And, Your Honor, I hope I'm not
11:35:50  15  getting ahead of myself, but I think this is
11:35:52  16  closely related to the first is whether the bar
11:35:54  17  should extend to experts.  And we think that is
11:35:58  18  too limiting.
11:35:58  19       We haven't -- I personally haven't
11:36:00  20  seen a limitation like that in a very long time
11:36:02  21  in a Protective Order.  And I think for the
11:36:06  22  obvious reason that these are very highly
11:36:08  23  specialized issues in this field, for example,
11:36:11  24  I'd be surprised if there's more than ten experts

35

11:36:13  1  worldwide who would be appropriate experts for
11:36:16  2  the technology here.
11:36:18  3       And it's too limiting, I think, to
11:36:20  4  require that they agree to a prospective bar.
11:36:23  5  They will, of course, sign on to the
11:36:26  6  acknowledgement of the Protective Order.  They'll
11:36:28  7  be bound by that.
11:36:29  8       They will be the subject of the
11:36:31  9  jurisdiction of the Court for any violation.  But
11:36:32  10  equally important, I think experts play a
11:36:35  11  different role.  They are, at some level,
11:36:36  12  objective.
11:36:37  13       We go to them because we hope they
11:36:39  14  are objective and we hope they will give an
11:36:41  15  objective analysis of our positions.  And if they
11:36:44  16  agree or feel they have a strong position to
11:36:46  17  present, we will be an advocate for that position
11:36:46  18  in the Court.
11:36:50  19       But first off, they're objective
11:36:52  20  technical experts.  And when we get to the later
11:36:54  21  question of in-house folks, I think that's an
11:36:57  22  important distinction.  But I'll leave it at that
11:37:00  23  for now.
11:37:01  24       THE COURT:  As to experts, though, I

36

11:37:05  1  hear you arguing, Look, kind of an unfairness
11:37:09  2  issue as to them because this is a smaller pool.
11:37:12  3  And even though the bar as to them is suggested
11:37:17  4  to be a year after the litigation ends, not two
11:37:20  5  years, you know, you're talking about cabining
11:37:24  6  the ability of a smaller pool of people to work,
11:37:27  7  and therefore it's more unfair than cabining the
11:37:33  8  right of lawyers to work in prosecution for a
11:37:36  9  particular two-year period after the litigation.
11:37:39  10       It's about fairness; am I right?
11:37:45  11       THE COURT:  Mr. Marsden.
11:37:46  12       MR. MARSDEN:  I had my mute on, Your
11:37:48  13  Honor.  I apologize.
11:37:49  14       THE COURT:  It's all right.
11:37:50  15       MR. MARSDEN:  To some degree, it's
11:37:51  16  about fairness in terms of their ability to make
11:37:53  17  a living through consulting.  Often these are
11:37:55  18  academics.
11:37:56  19       Obviously, sometimes they're
11:37:58  20  retirees.  But, and important, I think, is just
11:38:04  21  really whether the risk is a significant risk
11:38:07  22  with a consultant whose value as a consultant is
11:38:11  23  entrusted by the client that hires him or her.
11:38:14  24  And by definition, those clients expect that

37

1 their confidential information will be retained
2 as confidential, not to them.
3         And even though that consultant may
4 consult for others in the industry that he or she
5 won't share with others in the industry.  So it's
6 very different than an in-house person whose sole
7 interest is advancing the interest of his or her
8 company.
9         So I think it's both a fairness
10 about in terms of livelihood, but also much
11 smaller risk in terms of the ability to
12 compartmentalize the information after using it.
13         THE COURT:  How's it different than
14 with respect to outside counsel?  I mean, I think
15 the defendants would say, Look, there's some of
16 the same risks.  I mean, I hear your point about
17 fairness and maybe a smaller -- to the extent
18 that the other side would say, Look, you know, if
19 what we're worried about is the unethical person,
20 right, because there are other bars in the
21 Protective Order in terms of what can be done
22 with the information otherwise.
23         But if we're worried about the
24 person that would still try to get around this

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

38

1 issue, you know, in terms of protecting
2 confidential information, why wouldn't you have
3 some of the same concerns about an expert or
4 consultant, you know, sharing some part of that
5 information as you would with outside counsel
6 doing it with respect to another case?
7         Why are they so different?
8         MR. MARSDEN:  Well, I guess, I may
9 have missed the question, but my understanding
10 generally with the concern with counsel is
11 counsel who would be involved in prosecuting new
12 claims in the Patent Office and the risk being
13 that the information would be used to write new
14 broader claims that would cover a product that
15 was previously not covered.  And we obviously all
16 agree on that and we proposed such a bar.
17         As to just generally whether lawyers
18 are more trustworthy than experts, I think we're
19 all trustworthy.  We have certain obligations
20 that we agree to abide by in terms of the Rules
21 of Ethics.
22         But the expert, by signing on the
23 Protective Order, is also going to agree to be
24 bound by that Protective Order and to answer for

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

39

1 any violation of the Protective Order in the
2 Court.
3         But more importantly, as I said
4 earlier, his or her motivation is to be an honest
5 broker through all of his clients, because that's
6 how one gets hired as a consultant in terms of
7 being trusted with confidential information and
8 not showing it with competitors.
9         THE COURT:  Okay.  All right.
10         Let me hear from M&G on this issue.
11         MS. DORTENZO:  Yes, Your Honor.
12 It's Megan Dortenzo.
13         Again, first off with respect to the
14 prosecution bar, from M&G's point of view, we see
15 the issue being whether the bar extends to, you
16 know, post and pre-grants or post-grant
17 proceedings.  We would -- one thing that didn't
18 make it into the letter, but I'd like to note is
19 all three of the INVISTA patents at issue in this
20 lawsuit were issued in 2011, which means we're
21 well within the two-year period for a reissue in
22 which you absolutely can broaden the claims of
23 those.
24         There's -- actually the two years

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

40

1 will end in 2013 in actually respectively
2 February, April and May of 2013.
3         So with respect to the bar going to
4 post-grant proceedings, obviously we have an
5 issue with INVISTA's current patent in that
6 regard.
7         With respect to experts and
8 consultants, we are totally of the mindset that
9 consultants and experts, you know, will abide by
10 the confidentiality provisions of this Protective
11 Order.  That's not really at issue.
12         What's at issue is will these
13 consultants and experts have a prosecution bar?
14 And as Mr. Marsden pointed out, these experts
15 typically are academics, retirees.  They do not
16 traditionally work with the PTO.
17         They're not typically hired to help
18 somebody prosecute patents or work on post-grant
19 proceedings involving patents.  Maybe
20 occasionally a declaration, but, for the most
21 part, they're not.  So we stand by the fact that
22 it's not a hardship for experts and consultants.
23 If it is or if INVISTA has an expert or
24 consultant that they want, but this bar is

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

41

11:42:35  1  prohibiting their engagement, certainly we would
11:42:37  2  entertain looking to waive that.  But not just
11:42:41  3  for everybody, because it's really more of a
11:42:43  4  rarity, from our point of view.  And the
11:42:45  5  confidentiality, of course, is taken care of.
11:42:49  6       The last idea is this idea of the
11:42:53  7  post-grants with regard to, you know, oppositions
11:42:56  8  and nullifications.  Again, I'm dealing in the
11:42:58  9  European realm, because that seems to be the
11:43:01  10  other area where our clients have issues as well
11:43:05  11  as here.
11:43:05  12       The issue reissue that we talked
11:43:07  13  about here, the United States, as you probably
11:43:09  14  know in September, is adopting post-grant
11:43:12  15  reviews.  That's part of the America Invent Act.
11:43:15  16  We don't know what those rules are.
11:43:17  17       There's a -- the Patent Office
11:43:19  18  hasn't drafted them.  They haven't posted them.
11:43:21  19  But I know they will take effect in September.
11:43:23  20       And so I guess, as we pointed out in
11:43:27  21  our brief in the D.C. case that was cited there,
11:43:32  22  that, you know, it's very difficult basically to
11:43:38  23  ignore information that you learn, you know, as
11:43:41  24  you're drafting claims or as you're going --

43

11:44:47  1       MS. DORTENZO:  Well, I guess I
11:44:48  2  question:  What do you mean by prosecution?  Is
11:44:50  3  prosecution, as you use it, just filing an
11:44:53  4  initial application and getting that initial
11:44:55  5  grant or does it also include reissues, and
11:44:58  6  reissue exams and things like that?
11:44:59  7       THE COURT:  It does not.  So I'm
11:45:01  8  distinguishing.
11:45:01  9       I mean, because I understand the
11:45:03  10  issue here really to be distinguishing between
11:45:08  11  the prosecution as the lead up to obtaining the
11:45:11  12  patent versus a description of prosecution that
11:45:16  13  would include that, and would include reexamine
11:45:19  14  proceedings, and would include reissue
11:45:21  15  proceedings and would include other proceedings.
11:45:25  16       So, yes, I am distinguishing it
11:45:28  17  because I understand that to be the issue.  So if
11:45:30  18  you were to if look at prosecution as what
11:45:36  19  INVISTA means, would you acknowledge that that
11:45:39  20  has a broader array of concerns then --
11:45:43  21       MS. DORTENZO:  Yes, Your Honor.
11:45:43  22       THE COURT:  Okay.  All right.
11:45:44  23       I mean, Judge Thynge, I know, talked
11:45:46  24  about that a little bit as well.  But I take it,

42

11:43:44  1  moving forward with strategy.  So it's -- we're
11:43:45  2  trying to prevent that from happening.
11:43:48  3       There are other Protective Orders
11:43:49  4  that we've been involved with that do handle
11:43:51  5  post-grant reviews.  They've been in other
11:43:54  6  jurisdictions.
11:43:55  7       And so I just, I guess, throw it out
11:43:58  8  there that this is a grave concern to M&G in
11:44:01  9  light of the fact that they are reissues and
11:44:03  10  other foreign proceedings taking place.
11:44:05  11       THE COURT:  And would you
11:44:07  12  acknowledge, I mean, the plaintiff's point would
11:44:09  13  be, Look, if you were categorizing each of the
11:44:11  14  proceedings that are in the parenthetical in your
11:44:14  15  suggestion, in your suggested paragraph with
11:44:18  16  respect to this issue, which include, not just
11:44:21  17  prosecution, but reexamine, reissue, et al, that
11:44:27  18  it's really prosecution that offers the most
11:44:30  19  broad and significant prospect of all those types
11:44:34  20  of proceedings of having an elicit effect on
11:44:39  21  claim scope.
11:44:41  22       I mean, would you acknowledge that
11:44:43  23  prosecution of all of them is the most worrisome
11:44:46  24  of all?

44

11:45:48  1  your point as to the other types of proceedings.
11:45:51  2       All right.  Any argument on this
11:45:53  3  from Auriga's counsel?
11:45:57  4       MR. OSLAN:  Yes, Your Honor.  This
11:45:57  5  is Reed Oslan from Auriga.
11:46:02  6       As Your Honor has mentioned, there's
11:46:05  7  also -- INVISTA has mentioned we already have, as
11:46:10  8  set forth in the PO, the Protective Order without
11:46:13  9  a prosecution bar.  We already have, you know,
11:46:15  10  limitations that anybody who's signing on to the
11:46:19  11  Protective Order is going to be bound by, you
11:46:21  12  know, for example, to use this exclusively for
11:46:23  13  the litigation.
11:46:25  14       And so, for that reason, I think
11:46:27  15  there's good reason for, and again similar to the
11:46:32  16  discussion that you had in the ruling on the
11:46:35  17  first point about German counsel, you know, the
11:46:37  18  burden is on the person seeking to further
11:46:39  19  restrict to show that that restriction is
11:46:42  20  reasonable.  And as we mentioned in our brief,
11:46:46  21  the In Re:  Deutsche Bank case since getting a
11:46:50  22  prosecution bar, we need to, first of all, have
11:46:53  23  established what information is triggering the
11:46:57  24  need for this bar.

45

11:46:59 1    I don't think that's been adequately
11:47:02 2 set forth.  If this is going to apply to the
11:47:06 3 in-house people, those people are only seeing
11:47:08 4 confidential information, not just highly
11:47:11 5 confidential information.
11:47:12 6    So I think there's a question as to,
11:47:14 7 you know:  What information really is it that is
11:47:17 8 prompting this prosecution bar?  I don't think
11:47:20 9 there's been fully explained, also, what the
11:47:22 10 proper scope is.  There's no agreement on that
11:47:24 11 issue.
11:47:25 12    Should it be just in-house counsel?
11:47:28 13 Should it be the experts as well?
11:47:30 14    I think that -- I think that the
11:47:33 15 policy reasoning behind having a bar would apply
11:47:36 16 equally to anyone who has exposure to whatever
11:47:42 17 this information is.  Presumably, in my view, it
11:47:45 18 should be limited only to those people who are
11:47:47 19 having access to highly confidential information
11:47:50 20 presumably if this information is going to, you
11:47:53 21 know, prompt the prosecution bar.
11:47:54 22    That's highly, highly confidential
11:47:56 23 information.  It isn't just going to get a highly
11:47:59 24 confidential designation.

47

11:49:03 1 think currently the language is written to the
11:49:05 2 extent that they're barred the duration of the
11:49:08 3 litigation, plus one or two years.  I think it
11:49:10 4 makes more sense to be for the duration of their
11:49:15 5 involvement in the litigation, plus one year.
11:49:16 6    If someone's role in the litigation
11:49:19 7 is terminated, if someone stops using a
11:49:21 8 consultant or if some in-house counsel or
11:49:25 9 representative, you know, ceases being involved
11:49:27 10 in the litigation, I don't think they need to be,
11:49:30 11 you know, hamstrung for however long the case
11:49:33 12 drags out.  If they withdraw from the case, you
11:49:36 13 know, they can only exit or whatever.  I think
11:49:39 14 that's when that clock should start.
11:49:41 15    Again, the subject matter covered
11:49:44 16 reasonably reflects the risk that has to be
11:49:47 17 shown.  I think that's similar to what
11:49:50 18 information is designated in this.
11:49:53 19    I'm not sure that the subject matter
11:49:56 20 has been explained as to why it needs yet another
11:50:02 21 level of protection over and above what's already
11:50:06 22 offered in terms of the other clauses in the
11:50:10 23 Protective Order that protect this information.
11:50:12 24    So I think that's really where we're

46

11:48:00 1    So, if anything, it seems that the
11:48:02 2 scope should only apply to experts who have
11:48:04 3 access to this highly confidential information as
11:48:06 4 opposed to in-house people who may not have
11:48:09 5 access to that upper level information.
11:48:11 6    In terms of the duration of the bar,
11:48:17 7 my understanding is the more typical time frame
11:48:20 8 is one year.  I think, again, it makes sense to
11:48:24 9 have it apply equally across the bar to whoever
11:48:27 10 this bar applies to.
11:48:28 11    If this bar is not to be necessary,
11:48:30 12 I understand one year is more typical.  I don't
11:48:33 13 think there is a need for a two-year bar.
11:48:35 14    And kind of getting to the third
11:48:40 15 issue, you know, in-house counsel versus in-house
11:48:44 16 representatives.  I think to the extent that
11:48:48 17 does --
11:48:49 18    THE COURT:  Hold on on that one
11:48:50 19 because we'll get to that separately.
11:48:52 20    MR. OSLAN:  Right.  Right.
11:48:53 21    I'm just going to mention, to the
11:48:54 22 extent that either counsel, or representative or
11:48:58 23 experts, for that matter, to the extent that
11:49:01 24 anybody is bound by this Protective Order, I

48

11:50:15 1 not fully convinced that a bar is even necessary.
11:50:18 2 To the extent one is necessary, I would agree
11:50:21 3 with M&G, in terms of the scope regarding, you
11:50:25 4 know, should it apply to prosecution in terms of
11:50:29 5 someone trying to enlarge the scope of their own
11:50:32 6 claim as opposed to challenging someone else's
11:50:35 7 claims or something like that.
11:50:36 8    But, otherwise, I just don't think
11:50:38 9 that either group has shown, you know, why a bar
11:50:42 10 is necessary or provided a reasonable
11:50:47 11 justification for who this does apply to or who
11:50:54 12 it doesn't apply to.
11:50:55 13    THE COURT:  Can I just ask one
11:50:57 14 question as to your proposal?  As to consultants
11:51:00 15 and experts, in one extent, you go further than
11:51:02 16 any of the parties, which is in that proposal on
11:51:04 17 Page 9.
11:51:04 18    You say that experts and
11:51:06 19 consultants, not only should be bound by the
11:51:08 20 patent prosecution bar for a year after the end
11:51:13 21 of the litigation, but also that they shouldn't
11:51:14 22 be allowed to work for another party or nonparty
11:51:17 23 competitor on any consulting project, which I
11:51:20 24 read to be an even broader restriction on them.

49

11:51:24  1   How does that square with your --
11:51:27  2   kind of your questioning of whether a prosecution
11:51:29  3   bar is needed in the first place?  Why does it
11:51:34  4   make sense to treat experts and consultants more
11:51:34  5   stringently?
11:51:38  6   MR. OSLAN:  Right.  I'll caveat that
11:51:40  7   proposed language.  I'm offering that up in the
11:51:44  8   assumption that the bar is put in place.
11:51:46  9   So to the extent that a bar is not
11:51:48 10   needed, I'm perfectly willing to walk away from
11:51:50 11   that restriction.
11:51:51 12   I think the Protective Order without
11:51:57 13   a bar has sufficient protection for all involved.
11:52:00 14   And if there is no bar for, you know -- for
11:52:02 15   anyone, obviously that piece can get stricken
11:52:06 16   with the prosecution bar, to the extent it's put
11:52:11 17   in place.
11:52:11 18   To the extent that the Court does
11:52:13 19   wish to make you enter a prosecution bar clause
11:52:16 20   in the Protective Order, I think it just goes
11:52:19 21   along with kind of the same theory and policy
11:52:22 22   behind, you know, why a bar is necessary.  It's
11:52:25 23   there to prevent this cross-pollination,
11:52:31 24   inadvertent cross-pollination of the one person's

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

50

11:52:33  1   pollination of confidential, highly confidential
11:52:35  2   information with someone else's highly
11:52:37  3   confidential information.
11:52:38  4   So if this professor, or former
11:52:41  5   employee or retiree has access to one party's
11:52:48  6   highly confidential information for the same
11:52:49  7   reason they can't prosecute, I think it makes
11:52:51  8   sense also to say, they refrain from, you know,
11:52:54  9   consulting with someone else directly in that
11:52:58 10   field for that same period of time to prevent
11:53:01 11   that same cross-pollination and accidental
11:53:03 12   disclosure, use of that information.
11:53:05 13   THE COURT:  Okay.  And last
11:53:07 14   question, Mr. Marsden or Ms. Dortenzo:  Do you
11:53:10 15   want to make a record, at least for your own
11:53:12 16   purpose, as to why you feel there is some need
11:53:15 17   for at least some prosecution bar in this case?
11:53:20 18   I know you differ as to the scope, but vis-a-vis
11:53:23 19   the nature of the confidential information that
11:53:25 20   we relate to this technology or that is going to
11:53:28 21   be at issue in this case.
11:53:29 22   MR. MARSDEN:  Sure.  This is William
11:53:31 23   Marsden.  I'll address it briefly and allow
11:53:33 24   Ms. Dortenzo to do the same.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

51

11:53:35  1   But this is a very highly
11:53:37  2   specialized field.  There are not a huge number
11:53:41  3   of players.
11:53:42  4   The information that will be
11:53:44  5   exchanged in the litigation is of the highest
11:53:47  6   confidential nature.  Some of it would qualify as
11:53:50  7   trade secrets.  And by definition, someone with
11:53:55  8   that information could potentially go to the
11:53:57  9   Patent Office and try to write claims that were
11:54:00 10   broad enough to cover some of the processes and
11:54:04 11   products that will be disclosed and discussed in
11:54:08 12   the litigation.
11:54:08 13   And so, you know, consistent with, I
11:54:10 14   think, a fairly significant and consistent body
11:54:15 15   of case law, we think it's an appropriate
11:54:16 16   restriction and it's a developing market.  So
11:54:18 17   there's a lot of motivation, I think, for folks
11:54:22 18   who want to stake out positions.  And the risk
11:54:24 19   is, therefore, high.
11:54:25 20   THE COURT:  Ms. Dortenzo, anything
11:54:27 21   you want to add to that?
11:54:28 22   MS. DORTENZO:  Just more the same,
11:54:30 23   Your Honor.  But the Courts traditionally have
11:54:32 24   always recognized that technical information

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

52

11:54:35  1   along the lines of trade secrets that they
12:23:36  2   warrant a very high level of protection because
12:23:36  3   of the price of the serious injury that could
12:23:36  4   happen upon the improper disclosure, use of that
12:23:36  5   information.
12:23:36  6   And part of that, because it's --
12:23:36  7   this is a developing field.  And it's a very
12:23:36  8   important field with the players to protect that
12:23:36  9   in the Patent Office.  It is very critical.
12:23:36 10   And if the Courts recognize what's
12:23:36 11   technical information, what you learn, it's very
12:23:36 12   difficult to selectively suppress or selectively
12:23:36 13   use it as needed or as determined by a piece of
12:23:36 14   paper.  So, in that regard, prosecution bar would
12:23:36 15   certainly go a long way in terms of protecting
12:23:36 16   the technology, especially one where you're
12:23:36 17   trying to expand claims.
12:23:36 18   THE COURT:  Okay.  All right.
12:23:36 19   MR. OSLAN:  May I?
12:23:36 20   THE COURT:  Sure.
12:23:36 21   MR. OSLAN:  I'd just like to say, as
12:23:36 22   I mentioned, to the extent that Your Honor wishes
12:23:36 23   to include prosecution bar based on those reasons
12:23:36 24   by INVISTA and M&G, it seems like it should only

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

53

1  apply to those people who have access to highly
2  confidential, trade secret, top secret formulas.
3      Obviously, you're not to trust only
4  confidential information.  To the extent the bar
5  is entered, it seems it would only apply to those
6  who have highly confidential information.
7      THE COURT:  Okay.  Thank you.
8      I appreciate the argument.  In terms
9  of analysis as to this issue here, I think as was
10  noted in M&G's brief, the test is that a party
11  seeking the Protective Order, and particularly a
12  prosecution bar in a Protective Order as well
13  bears the burden of showing good cause for its
14  implementation.
15      And I think here, in some different
16  ways, M&G and, to some degree with respect to
17  consultants, an expert, Auriga, are the side who
18  are asking for a prosecution bar that is more
19  restrictive in scope.
20      And when I examine the propriety of
21  whether or not to institute a prosecution bar and
22  what the terms should be, the Fed Circuit in the
23  In Re:  Deutsche Bank Trust Company Americas case
24  cited in M&G's brief has cited that I have to

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

54

1  examine not only whether there's the risk of
2  inadvertent disclosure, but even if such a risk
3  exists.
4      I have to balance that risk against
5  the potential harm to the opposing party from
6  restrictions imposed on the right to have the
7  benefit of counsel or experts of its choice.
8      I'm also mindful of looking to this
9  Court's precedent on this issue, including Judge
10  Thynge's opinion in Xerox Corp. vs. Google, Inc.,
11  which is cited in INVISTA's brief.  And as Judge
12  Thynge did, I'd acknowledge that there is some
13  risk, as in the patent prosecution context.
14      And by prosecution, I mean the
15  process leading up to the issuance of the patent.
16  That a person could also misuse confidential
17  information obtained in this case to have an
18  impact on claim terms during a re-examination
19  proceeding, or although she didn't mention this
20  in that case, a reissued proceeding for sure.
21      So I'd acknowledge there is that
22  risk.  But like Judge Thynge did in Xerox and
23  like Judge Robinson did in the Kenexa Brassring,
24  Inc. case cited in INVISTA's brief, I also see a

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

55

1  real distinction between what I'm referring to as
2  patent prosecution in which the way claims may be
3  broadened in any number of ways, as well as in
4  the specification.
5      And it just simply overall provides
6  much more significant opportunity for someone who
7  wished to misuse confidential information to have
8  an impact on claim scope.
9      I think that the case law and the
10  reality both leads to the conclusion that that
11  type of patent prosecution is the most risky area
12  here.  I also believe that some type of
13  prosecution bar makes sense for the reasons set
14  forth by Mr. Marsden and Ms. Dortenzo in light
15  particularly of the nature of the technology at
16  issue, and the way in which that technology is
17  new and changing in this field.
18      So I take that into account as well.
19  Also, like Judge Thynge did in Xerox, on the flip
20  side, when it comes to a prosecution bar, I also
21  think it's appropriate to acknowledge that when
22  you place additional restrictions in a bar, more
23  years or more people who are covered, those
24  restrictions can at least, in some ways, deny a

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

56

1  plaintiff re-examination counsel or other counsel
2  for reissue proceedings or experts of their
3  choice in matters that are really significant and
4  also have the impact of restricting the ability
5  of these parties to work.
6      And that's a serious concern.  And I
7  think Xerox took that into account as well.
8      And you know he lists, notes, as
9  Auriga did in its brief, while a patent
10  prosecution bar can be helpful and may be
11  necessary, it's also an extra layer of protection
12  on top of the other requirements of the
13  Protective Order, which in and of themselves
14  mandates the confidential information not be
15  misused in other proceedings in certain respects.
16  And the Federal Circuit noted that in In Re:
17  Deutsche Bank as well.
18      In light of all these factors and
19  the precedent in this court and in the absence of
20  any particularized showing that there's a
21  likelihood of misuse of information and
22  particular reexamine or reissue proceedings, I
23  find that INVISTA's proposal in Section 5(a)1 and
24  (b)1, which limits the prosecution bar as it

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

57

1 relates to outside counsel of record to what they
2 refer to as patent prosecution activities and not
3 to an extended list of other activities listed in
4 M&G's proposal, including reexamine and/or
5 reissue proceedings, I find that INVISTA's
6 proposal is more appropriate at this stage based
7 on the record before me.
8      And I would note that that Order, my
9 Order that INVISTA's proposal should be adopted,
10 appears to also have an impact on some other
11 portions of Section 5 in the draft Protective
12 Order where the language as to patent prosecution
13 is repeated.
14      But as to M&G and Auriga's proposal,
15 that experts and consultants be included in a
16 patent prosecution bar, albeit with respect to
17 one year after the litigation ends, I find that
18 that would be appropriate as well. I think that
19 the reasons suggesting some concern as to misuse
20 of confidential information and prosecution
21 proceedings by outside counsel could also well be
22 at issue with respect to experts and consultants.
23      And I take Ms. Dortenzo's points
24 that, again, we're talking about experts and

58

1 consultants participating in patent prosecution,
2 which although there may be a limited sphere of
3 these experts and consultants in the world, we're
4 also talking about a limited sphere of their
5 work. And one that may well be seen as somewhat
6 rare in light of the nature of the work that they
7 do.
8      As to Auriga's additional limiter
9 that would restrict experts and consultants from
10 even working with another entity in this case,
11 that is the second portion of their restrictions
12 in their proposed paragraph, I don't think that's
13 appropriate here.
14      I don't think, based on the record
15 here, it makes sense to treat experts in a way
16 more harshly than we're treating outside counsel
17 as to the restrictions on their work. And so
18 that limitation I find should not be included in
19 this respective section of the brief.
20      So that's my Order with respect to
21 this issue, which I know implicates a number of
22 paragraphs in the Protective Order.
23      And the last issue that we have to
24 take up is the question of access to designated

59

1 confidential material by in-house business
2 representatives. And here again, why don't I
3 hear from INVISTA first and then we'll hear from
4 the remainder of the parties after that.
5      MR. MARSDEN: Your Honor, I'll be
6 brief. This is William Marsden.
7      Really, to some extent, we think
8 this is form over substance. Whether a party
9 chooses to have an in-house legal department to
10 provide legal advice or decides it's more
11 efficient to use outside law firms to provide
12 that advice really is a business choice.
13      But once made, you know, they should
14 recognize that it may have consequences in a
15 proceeding like this, for example, that is
16 handled. Here their outside counsel in both
17 cases will have full access to the highly
18 confidential information.
19      The Protective Order expresses that
20 they may provide advice to their client,
21 including advice based on their review of that
22 confidential information. And it just obviously
23 prohibits them from sharing that highly
24 confidential information directly with them or

60

1 disclosing it to them.
2      And, again, to the extent that there
3 would be a need for settlement purposes, for
4 example, that has never been a problem in my
5 experience to negotiate an agreement to provide
6 certain information to certain in-house decision
7 makers. So they can make an informed choice.
8      In fact, I think there have been
9 some exchanges of that type, even in this matter
10 already. So the fact that they've chosen to have
11 an outside counsel relationship rather than an
12 in-house counsel relationship shouldn't be viewed
13 as a hardship that would permit in-house folks
14 for whom the risks are too high as detailed in
15 the Sunstrand case and the Boehringer Ingelheim
16 case should not be a basis to provide access to
17 those types of people.
18      THE COURT: Just to make sure I
19 understand what is the issue here and
20 particularly, in your view, is your proposal
21 would allow up to two in-house counsel from
22 having access to the type of confidential
23 information discussed in the mid-level of
24 confidential information discussed in Section 5.

61

1  You just object to having in-house.  If you don't
2  have in-house counsel, you object to having two
3  in-house business decision -- business people.  I
4  should say, having that access.
5      Am I right?
6      MR. MARSDEN:  That's correct, Your
7  Honor.
8      THE COURT:  Okay.  Now, with respect
9  to M&G's proposal, which in essence summarizing
10  it says, look, to the extent that that two
11  in-house business people would or in-house
12  representatives who aren't lawyers would have
13  access, those have to be people who will make no
14  decisions, no competitive decision making in this
15  sphere for the period of time implicated in those
16  paragraphs.
17      Doesn't that get to your concern
18  about the difference between in-house counsel and
19  other in-house representatives and the potential
20  for misuse of confidential information as to
21  decision making?
22      MR. MARSDEN:  It partially addresses
23  our concerns, Your Honor.  And I don't know that
24  I -- we know a lot about the structure of M&G and

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

62

1  the roles of these folks.  But to the extent
2  someone were truly not involved in those
3  decisions, in a specialized business like that,
4  that would address some of our concerns.
5      But it would also sort of beg the
6  question about why they need access or how they
7  could actually contribute.  And the risks of the
8  information, you know, potentially being
9  compromised are still there.
10      THE COURT:  Okay.  Ms. Dortenzo, I'd
11  ask for your view.
12      I assume that one of the reasons why
13  you included that language was to get to the
14  concern raised by INVISTA; am I right?
15      MS. DORTENZO:  Absolutely, Your
16  Honor.
17      THE COURT:  And anything else you
18  wanted to add with respect to this particular
19  issue?
20      MS. DORTENZO:  Sure.  I just -- I
21  also don't think M&G should be penalized or
22  prejudiced just because they chose not to have
23  in-house counsel.  The work, the internal
24  workings and decisions about the litigation, you

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

63

1  know, sometimes those are made for a reason that
2  doesn't involve in-house counsel.
3      You know, we're outside litigation
4  counsel.  We're not -- we are not in with the
5  business plan or the nuts and bolts of the
6  company.
7      So the people that we have proposed
8  to INVISTA and Auriga to be the two business
9  people.  You know, they meet that limitation that
10  they're not the decision makers.  They're not
11  involved in patents.
12      They just meet that criteria.  Yet
13  they're able to have a meeting behind closed
14  doors and talk about how M&G wants to handle
15  certain matters of the litigation, which may or
16  may not include outside counsel.
17      So we just feel that they would be
18  totally hampered if they're not allowed to have
19  two people have access to the confidential
20  information.  To that regard, I want to also
21  throw out there that M&G believes or we will
22  agree with Auriga's position, which is to have --
23  if I noted it correctly, which is to have a level
24  playing field, have INVISTA identify two business

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

64

1  people that also meet that criteria.
2      And then all three parties in this
3  lawsuit would have two business people and not
4  two in-house counsel, if that's a viable
5  alternative.
6      THE COURT:  And am I right, Ms.
7  Dortenzo, that the main thrust of your proposal,
8  which I think starts on Page 12, is one about
9  parity?  That, in other words, you'd say, Look,
10  we'll deal with the issue of worry about the
11  issue that worries about whether in-house
12  representatives who aren't lawyers might have a
13  greater chance of misuse by saying, Look, these
14  people, whoever we designate, they won't be
15  involved in competitive decision making in this
16  case.
17      But our concern really is one of
18  parity.  Why should they get two in-house counsel
19  to be able to have access to this information and
20  we have nobody because we don't have any in-house
21  counsel; is that right?
22      MS. DORTENZO:  Yes, Your Honor.
23      THE COURT:  Okay.  And let me hear
24  from Auriga as to this issue as well.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

65

MR. OSLAN:  Sure.  This is Reed
Oslan again.  So I think our position is very
similar to M&G's.

As INVISTA mentioned, it was on the
order of ten experts in this field.  Obviously,
when we're looking at documents, I'm not one of
those people, ten people.

So it would be great to have
somebody day in and day out of this stuff to be
able to assist us in this litigation-appropriate
friction.  I think that kind of explains why
in-house is definitely an advantage.

Also, I think to allay some of these
concerns like we talked about before, this level
is only at a confidential level.  These people,
even though these people, be they attorneys or
just non-attorney representatives, they're only
going to have access to confidential materials.

So that's just largely allow any
concerns about, you know, showing the crown
jewels to your competition type of thing.

And then, finally, the one major
distinguishing point between our proposal on 11
and M&G's proposal that you pointed out is I

67

1465, a 1984 decision, the Fed Circuit has
indicated that in examining whether particular
in-house employees should have access to certain
kinds of confidential information, a particularly
key factor is whether those persons are engaged
in competitive decision making because of the
possibility that confidential information once
learned could have a wrongful impact down the
road on future business decisions with respect to
the same sphere of business that's implicated in
the current lawsuit.

I'm also mindful in addressing this
issue of issues of parity.  I note this,
INVISTA's proposal would allow, in light of the
realities of these entities, would allow for an
imbalance of in-house representatives to have
access to confidential information to attorneys
for them.

But, in practice, no in-house
attorneys for the other parties since the other
parties just don't have in-house counsel.

And, you know, the absence of some
kind of parity with respect to this issue could
have some prejudice to the other defendants in

66

think M&G is slightly more broad, more farther
reaching than ours.

Their's kind of mimics the scope of
the prosecution bar that they were also hoping to
implement where it's not just, you know,
prospective, you know, getting your own claims
type information.  But it's all prosecution or
examination reissued and appearance.

So I think M&G is just a little bit
too broad in our view.  And that's why we didn't
join those and made our own proposal on 11.

THE COURT:  Okay.  Thank you.

All right.  As to this issue here,
as I read it, it's INVISTA who wishes to have a
slightly more restrictive portion of the
Protective Order in that they wish to present
strict provisions of confidential information
simply to two in-house counsel per side and not
to permit up to two other in-house
representatives who are not lawyers to have
access to this level of confidential information.

I note that in the case law,
including in the U.S. Steel Corp. vs. United
States case from the Federal Circuit 730 F. 2d

68

terms of their ability to be able to have at
least some internal employees who can assist in
figuring out what happens to this case in here.

So, for those reasons, imbalancing
these considerations, I think M&G's proposal as
is set forth in Section 5(a)11, would get to --
would appropriately balance these concerns.

It would, on the one hand, eliminate
the concern that the two in-house non-lawyers,
that their proposal, to have access to the
information, would misuse the information in
future competitive decision regarding this
technology, because that proposal indicates that
those folks should not be involved in decision
making in the space going forward.

And secondly, it allows for parity.
It allows for at least two persons per side
in-house to be able to have this access, so that
they can contribute to the litigation and
decisions about this particular litigation.

And that seems to me to be a
reasonable way to address concerns about the
misuse of information by in-house representatives
that were set forth in the Ingelheim

69

12:23:47 1 Pharmaceutical case that INVISTA cited.

12:23:47 2            And so for that reason, I find that

12:23:47 3 M&G's proposal in Section 5(a)11 should be

12:23:47 4 included in the Protective Order with respect to

12:23:47 5 this issue. Obviously, it would be limited with

12:23:47 6 respect to the description of patent prosecution

12:23:47 7 activities based on the prior ruling that I've

12:23:47 8 given.

12:23:47 9            But that, otherwise, it's the most

12:23:47 10 appropriate of the parties' proposal and should

12:23:47 11 be included in the Protective Order. So that's

12:23:47 12 my decision as to this last issue.

12:23:47 13            Knowing that I've made a decision as

12:23:47 14 to these three issues, let me ask first: Is

12:23:47 15 there any other issue that I need to take up at

12:23:47 16 this stage with the parties?

12:23:47 17            From INVISTA's perspective?

12:23:47 18            MR. MARSDEN: Your Honor, I just

12:23:47 19 have one point of clarification. With respect to

12:23:47 20 your ruling on the last point, we had already

12:23:47 21 exchanged with M&G the two in-house lawyers that

12:23:47 22 would have access to confidential information.

12:23:47 23 And they are, in fact, both decision makers.

12:23:47 24            In fact, that's one of the reasons

Hawkins Reporting Service

715 N. King Street - Wilmington, Delaware  19801

302-658-6697

71

12:23:49 1 two additional folks to be a part of the group

12:23:49 2 that can get access to confidential information.

12:23:49 3            But it's not meant to limit the

12:23:49 4 ability of the two in-house counsel

12:23:49 5 representatives to be able to have the ability to

12:23:49 6 have impact on competitive decision making going

12:23:49 7 forward. Does that make sense?

12:23:49 8            MR. MARSDEN: Yes. Thank you, Your

12:23:49 9 Honor.

12:23:49 10            THE COURT: Okay.

12:23:49 11            MS. DORTENZO: Your Honor, this is

12:23:49 12 Megan Dortenzo.

12:23:49 13            May I speak?

12:23:49 14            THE COURT: Sure.

12:23:49 15            MS. DORTENZO: Two questions. One,

12:23:49 16 with respect to your clarification that you just

12:23:49 17 provided, I don't -- respectfully, I don't see

12:23:49 18 the difference between how in-house counsel can

12:23:49 19 be involved with competitive decision making, yet

12:23:49 20 business people cannot be, you know, involved in

12:23:49 21 competitive decision making because it seems to

12:23:49 22 me you're still circumventing the issue that

12:23:49 23 needed to be addressed.

12:23:49 24            THE COURT: The ruling is based on

Hawkins Reporting Service

715 N. King Street - Wilmington, Delaware  19801

302-658-6697

70

12:23:49 1 they were selected as our representative. So I

12:23:49 2 am a little concerned that we've now -- I'm

12:23:49 3 unclear as to whether they would or whether we

12:23:49 4 have to designate someone else if they were going

12:23:49 5 to be involved in competitive decision making.

12:23:49 6            THE COURT: No. I appreciate the

12:23:49 7 question and understand the question.

12:23:49 8            No. The reference to the -- under

12:23:49 9 my ruling, it's permissible that the in-house

12:23:49 10 counsel, the two in-house counsel that you

12:23:49 11 mentioned may well have a role in competitive

12:23:49 12 decision making in this space in the future.

12:23:49 13            The reason why I found that M&G's

12:23:49 14 proposal here should be included is that if we're

12:23:49 15 going to include not only in-house counsel, but

12:23:49 16 also two other non-lawyer representatives

12:23:49 17 in-house, then that raises concerns about those

12:23:49 18 particular people being competitive decision

12:23:49 19 makers for the reasons stated in the Ingelheim

12:23:49 20 Pharmaceutical case.

12:23:49 21            So, to the extent that their

12:23:49 22 proposal says these in-house non-lawyers won't be

12:23:49 23 involved in competitive decision making going

12:23:49 24 forward, that's the reason why I'm allowing those

Hawkins Reporting Service

715 N. King Street - Wilmington, Delaware  19801

302-658-6697

72

12:23:49 1 the -- in part on the case law set forth in

12:23:49 2 INVISTA's brief, for example, in the Ingelheim

12:23:49 3 Pharmaceuticals case. And for the reasons that

12:23:49 4 INVISTA referenced in its brief, which is that I

12:23:49 5 think our courts, and as decision makers, have

12:23:49 6 identified kind of a dual way of looking at

12:23:49 7 in-house access to these documents.

12:23:49 8            With respect to in-house counsel,

12:23:49 9 it's been noted, including in that Ingelheim

12:23:49 10 Pharmaceuticals case that because counsel have

12:23:49 11 additional responsibilities, not just that

12:23:49 12 in-house business people don't have

12:23:49 13 responsibilities to the Court, responsibilities

12:23:49 14 to avoid is conflicts vis-a-vis -- vis-a-vis

12:23:49 15 their responsibilities as lawyers.

12:23:49 16            It provides some additional level of

12:23:49 17 comfort with respect to them that they won't

12:23:49 18 engage in misuse of information, which just isn't

12:23:49 19 present with respect to in-house non-lawyers.

12:23:49 20            And so our cases, including that

12:23:49 21 case, has treated in-house lawyers and

12:23:49 22 non-lawyers differently and has placed in-house

12:23:49 23 non-lawyers kind of in a realm of additional

12:23:49 24 worry when it comes to this issue.

Hawkins Reporting Service

715 N. King Street - Wilmington, Delaware  19801

302-658-6697

73

1  And the reason why I ordered your
2  proposal to be adopted is because you address
3  that concern with respect to in-house non-lawyers
4  by having an extra out that they wouldn't be
5  involved in decision making going forward.
6  So to the extent that our precedent
7  has suggested it should be more difficult for
8  in-house non-lawyers to get access to this
9  information, you have addressed that in your
10 proposal.  And so it's our precedent as described
11 by INVISTA in the letter that provides the
12 distinction.
13 MS. DORTENZO:  Okay.  One
14 clarification to get to my second question, but
15 there was also, in some of the case law, the
16 additional requirement that the lawyers be
17 admitted into this district.  They don't know if
18 those two people proposed are, but is that going
19 to be a restriction as well, that either they are
20 admitted into the State of Delaware or they're, I
21 guess, admitted before your Court?
22 THE COURT:  I'm not going to require
23 it at this stage.  No.
24 MS. DORTENZO:  Okay.  My second, I

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

74

1  guess, point that I would seek to clarify is with
2  respect to the prosecution bar.  I believe your
3  Order was that it would apply to, you know,
4  prosecution activities for enlarging the scope of
5  claims.
6  And we've spoken earlier, and you
7  indicated that the prosecution activities would
8  be getting the grant of initial application.
9  However, there is that two-year time period
10 post-grant wherein a reissue that a party could
11 seek to expand the claim language and all three
12 of the INVISTA patents are well within that
13 two-year period.
14 So, for purposes of your order, does
15 prosecution activities at least include the
16 two-year reissue period when one can expand its
17 scope of claims?
18 THE COURT:  At this stage, it does
19 not.  My order is simply going to involve -- and
20 for example, I'm just looking, for example, at
21 your proposal on Page 12, which in Paragraph 11
22 or subparagraph 11 when you list out patent
23 prosecution activities, you then list
24 re-examination, reissue, interference proceedings

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

75

1  or any other activities conducted before any
2  Patent Office in any country.
3  What I have in mind and what I
4  understood INVISTA to have in mind in their
5  proposal is simply the first of the types of
6  proceedings that are being referenced in their
7  parenthetical prosecution.  So I don't have in
8  mind that the bar would apply to re-examination,
9  or reissue or the additional type of proceedings
10 that are listed in the parenthetical.
11 MS. DORTENZO:  Okay.  Is this -- the
12 reason I'm asking for clarification, I thought
13 you also adopted, at some point, INVISTA's
14 language for prosecution activities, which
15 without the parenthetical.  But it does include
16 the qualifier that one would not expand the scope
17 of claims.
18 And again, the point of issue with
19 us is the same point that you exactly can expand
20 the scope of claims in that two-year reissue
21 period, which with the current understanding of,
22 Your Honor, that you know, they would be able to
23 have these attorneys expand the scope of claims
24 during the reissue, and also having the benefit

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

76

1  of seeing the M&G designated materials.
2  THE COURT:  Well, Mr. Marsden, it's
3  a fair question to ask, because it is true that
4  INVISTA's proposed language does, and I'm trying
5  to get to it -- yes.  Okay.
6  So, for example, I think in
7  subsection 5(a)1, the phrase that's used is
8  patent prosecution activities enlarging claim
9  scope...
10 MR. MARSDEN:  Right.
11 THE COURT:  When INVISTA uses that
12 phraseology, what types of prosecution
13 activities, enlarging claim scope do they have in
14 mind?
15 MR. MARSDEN:  I think, for the most
16 part, Your Honor, it would be an example in
17 continuation applications.
18 To address the specific issue that
19 Ms. Dortenzo has raised of a reissue, it is
20 possible in certain types of reissues for a party
21 to seek broadened claims.  And, obviously, our
22 language would cover that.
23 So to the extent that somebody was
24 going to seek broader claims for reissue, then

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

77

12:23:51 1 obviously those folks would be not participating
12:23:52 2 pursuant to this language.
12:23:52 3      So I think we've covered that. My
12:23:52 4 understanding is there can be re issues where the
12:23:52 5 claims are not broadened.
12:23:52 6      So I think the categorical approach
12:23:52 7 of ruling out certain types of proceedings is not
12:23:52 8 the way to go. And simply dealing with the
12:23:52 9 broadening of claims is the better way to go.
12:23:52 10      THE COURT: Right. I mean, that, to
12:23:52 11 the extent that M&G's proposal was talking about
12:23:52 12 all types of proceedings implicated by each of
12:23:52 13 these different descriptors, reexamine, reissue,
12:23:52 14 prosecution, that was a concern to me. But,
12:23:52 15 yeah, to the extent that we're talking about
12:23:52 16 reissue proceedings enlarging the scope only not
12:23:52 17 just reissue proceedings at large, I can
12:23:52 18 understand why Ms. Dortenzo's concern would be a
12:23:52 19 concern.
12:23:52 20      It sounds like it's not a disputed
12:23:52 21 issue from INVISTA's perspective. It may be that
12:23:52 22 as the parties reduce this to a final version of
12:23:52 23 a Protective Order, you can make explicit --
12:23:52 24 build the nature of Mr. Dortenzo's concern in the

79

12:23:52 1      And I thank you for your arguments.
12:23:52 2 I'll look forward to speaking with you on this
12:23:52 3 case in the future. And I wish you all a very
12:23:52 4 good week.
12:23:52 5      MR. MARSDEN: Thank you, Your Honor.
12:23:52 6      THE COURT: Take care everybody.
12:23:52 7      MS. DORTENZO: Thank you, Your
12:23:52 8 Honor.
12:23:52 9      MR. MOORE: Thank you, Your Honor.
12:23:52 10      MR. CASTELLANO: Thank you, Your
12:23:52 11 honor.
12:23:52 12      (Teleconference concluded at 12:23
13 p.m.)
14
15
16
17
18
19
20
21
22
23
24

78

12:23:52 1 actual language that ends up in Section 5.
12:23:52 2      And since both sides aren't in
12:23:52 3 dispute about that, I suggest that that makes the
12:23:52 4 best sense.
12:23:52 5      With all that said, can the parties
12:23:52 6 give me a sense of when a reasonable time frame
12:23:52 7 to ask them to provide a final proposed
12:23:52 8 Protective Order that takes into account my
12:23:52 9 rulings would be? How many days subsequent to
12:23:52 10 today's date?
12:23:52 11      MR. MARSDEN: Your Honor, this is
12:23:52 12 William Marsden for INVISTA. I think we could do
12:23:52 13 that by Friday, perhaps earlier.
12:23:52 14      MS. DORTENZO: Megan Dortenzo, and I
12:23:52 15 agree.
12:23:52 16      THE COURT: Okay. I'll ask then
12:23:52 17 that the parties submit a final proposed
12:23:52 18 Protective Order taking into account the Court's
12:23:52 19 decision and the agreements reached here by no
12:23:52 20 later than the close of business Friday.
12:23:52 21      I'll review it and expect to enter
12:23:52 22 it soon thereafter, unless I have any questions.
12:23:52 23 With all that said, I appreciate everyone's time
12:23:52 24 here today.

80

1 State of Delaware)
   )
2 New Castle County)

3

4      CERTIFICATE OF REPORTER

5      I, Heather M. Triozzi, Certified
Professional Reporter, Registered Professional
Reporter and Notary Public in the State of
Delaware, do hereby certify that the foregoing
6 record, Pages 1 to 79 inclusive, is a true and
accurate transcript of my stenographic notes
7 taken on June 5, 2012, in the above-captioned
matter.
8
9      In witness whereof, I have hereunto
10 set my hand and seal this 6th day of June, 2012,
at Wilmington.
11

12      Heather M. Triozzi, CSR, RPR
      Cert. No: 184-PS
13      Exp:`Permanent

14

15

16 DATED: June 6, 2012
17
18
19
20
21
22
23
24

# Exhibit D

## Robert Oakes

| | |
|---|---|
| **From:** | Robert Oakes |
| **Sent:** | Wednesday, June 27, 2012 10:45 AM |
| **To:** | 'Dortenzo, Megan' |
| **Cc:** | William Marsden; 'Prince, Troy'; 'Comiskey, Christopher'; 'Reid Huefner (rhuefner@kirkland.com)'; dmoore@potteranderson.com; rhorwitz@potteranderson.com |
| **Subject:** | RE: Disclosure of documents/info to foreign counsel |

Megan,

Although we do not believe that any Invista confidential documents are relevant to the proceedings in Germany, to avoid burdening the Court with another discovery dispute we will agree to allow M&G to disclose Invista documents produced in this litigation to attorneys at Hoffmann Eitle, on the condition that anyone at Hoffmann Eitle receiving Invista confidential information will first sign the Protective Order Acknowledgement agreeing to submit to the jurisdiction of the Delaware Court for purposes of enforcing the Protective Order.  Please confirm that all individuals at Hoffmann Eitle who receive Invista confidential information will first sign the Protective Order Acknowledgement.

Regards,

Bob

---

**From:** Robert Oakes
**Sent:** Monday, June 25, 2012 2:50 PM
**To:** 'Dortenzo, Megan'
**Cc:** William Marsden; Prince, Troy; Comiskey, Christopher; Reid Huefner (rhuefner@kirkland.com); dmoore@potteranderson.com; rhorwitz@potteranderson.com
**Subject:** RE: Disclosure of documents/info to foreign counsel

Megan,

Our main client contact has been traveling and we have not had an opportunity to discuss this issue with them yet.  We will try to provide you an answer on this issue by Wednesday.

Regards,

Bob

---

**From:** Dortenzo, Megan [mailto:Megan.Dortenzo@thompsonhine.com]
**Sent:** Monday, June 25, 2012 1:51 PM
**To:** Robert Oakes
**Cc:** William Marsden; Prince, Troy; Comiskey, Christopher; Reid Huefner (rhuefner@kirkland.com); dmoore@potteranderson.com; rhorwitz@potteranderson.com
**Subject:** RE: Disclosure of documents/info to foreign counsel

Bob –

Thank you for the update.  As you know we are interested in moving this issue forward.  If we don't have an answer from you by Wednesday (which will be one week from our last meeting on this topic, and over 3 weeks from the dispute conference with the court), we will proceed with the court's dispute procedure to resolve this issue.  Thus, in the event

1

you either decide not to agree to M&G disclosing all Invista documents and information with Hoffmann Eitle, or you still have no decision by Wednesday June 27th, please let us know your availability to contact the court for a day/time for a dispute conference with Magistrate Judge Burke.  We prefer to contact the court as soon as possible, such as wed afternoon or thurs morning.

Thank you.

Megan

---

**From:** Robert Oakes [mailto:RMO@FR.com]
**Sent:** Monday, June 25, 2012 1:30 PM
**To:** Dortenzo, Megan
**Cc:** William Marsden; Prince, Troy; Comiskey, Christopher; Reid Huefner (rhuefner@kirkland.com)
**Subject:** RE: Disclosure of documents/info to foreign counsel


Megan,

We are in the process of conferring with our German colleagues and client, and hope to have an answer for you on this in the next couple of days.

Regards,

Bob

---

**From:** Dortenzo, Megan [mailto:Megan.Dortenzo@thompsonhine.com]
**Sent:** Monday, June 25, 2012 1:09 PM
**To:** Robert Oakes
**Cc:** William Marsden; Prince, Troy; Comiskey, Christopher; Reid Huefner (rhuefner@kirkland.com)
**Subject:** Disclosure of documents/info to foreign counsel

Bob –

I am following up on our call last Wednesday about Invista consenting to M&G disclosing Invista (and Indorama/Auriga) documents and information to its foreign counsel Hoffmann Eitle.  You requested time to confer with your German office.  Have you done that?  Do you have an answer on this issue?
Thank you.

Megan

**Megan D. Dortenzo**| IP Practice Group Leader | **Thompson Hine LLP**
3900 Key Center, 127 Public Square | Cleveland, OH  44114
**Office:** 216.566.5636 | **Mobile:** 440.465.1146
**Fax: 216**.566.5800 | **Email:** Megan.Dortenzo@ThompsonHine.com
**Web:** http://www.ThompsonHine.com

**Celebrating 100 years of client service excellence.**

Atlanta | Cincinnati | Cleveland | Columbus | Dayton | New York | Washington, D.C.

**********************************************************************************************************

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized use or disclosure is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

IRS CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.(FR08-i203d)

**********************************************************************************************************

# Exhibit E

# REDACTED
# IN ITS ENTIRETY

# Exhibit F

# REDACTED
# IN ITS ENTIRETY