## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INVISTA NORTH AMERICA S.À.R.L.,    )
and AURIGA POLYMERS INC.,          )
      Plaintiffs                 )
                                 )
v.                                 )    Civil Action No. 11-1007-SLR-CJB
                                 )
M&G USA CORPORATION and            )
M&G POLYMERS USA, LLC,             )
                                 )
      Defendants.                )

### MEMORANDUM ORDER

Pending before the Court in this patent infringement action is Defendants M&G

Corporation and M&G Polymers USA, LLC's (collectively, "M&G" or "Defendants") motion to

compel the production of certain documents (the "motion to compel") that Plaintiffs INVISTA

North America S.à.r.l. ("INVISTA") and Auriga Polymers Inc. ("Auriga") claim are privileged.

(D.I. 170) For the reasons discussed below, the Court GRANTS-IN-PART M&G's motion.

## I.     BACKGROUND

### A.     Procedural History

On October 21, 2011, INVISTA commenced this action, asserting that M&G infringes

certain claims of U.S. Patent Nos. 7,943,216 (the "'216 Patent") and 7,879,930 (the "'930

Patent"). (D.I. 1) On November 11, 2011, before M&G had answered, INVISTA amended its

Complaint to add additional claims of infringement of the 7,919,159 Patent (the "'159 Patent").

(D.I. 7 at ¶¶ 1, 36-45) INVISTA alleged that M&G infringed the patents-in-suit by (1) "making,

using, selling, offering to sell, and/or importing PET products, including without limitation their

PoliProtect APB and PoliProtect JB resins, covered by [certain claims of the '216 and '159

Patents]" and (2) by inducing their customers to infringe, or by contributing to their customers'

infringement of certain claims of the patents-in-suit. (*Id.* at ¶¶ 22, 27, 32-33, 38, 43)

On January 10, 2012, the Court was referred this case by Judge Sue L. Robinson for the purposes of discovery and exploring alternative dispute resolution; the referral was later expanded to include authority to resolve dispositive and nondispositive motions up to claim construction. (D.I. 45) In April 2012, Auriga was joined as a co-plaintiff. (D.I. 52)

In addition to the instant action, INVISTA and M&G (as well as their respective corporate affiliates and related entities) are currently engaged in intellectual property litigation on various fronts around the world. One such action is an opposition proceeding filed by M&G in the European Patent Office ("EPO") concerning INVISTA's European Patent No. 1 663 630 (the "EP '630 Patent"). (*See* D.I. 153; D.I. 273 at 1-2) The EP '630 Patent is the European counterpart patent to the '159 and '216 Patents. (D.I. 215, ex. A at ¶ 2)

## B. The Claw-Back Provision of the Protective Order

On June 11, 2012, the Court entered a Protective Order in this case that, *inter alia*, sets out a procedure to be followed in the event of inadvertent disclosure of allegedly privileged or work product-protected documents (the "claw-back provision"). (D.I. 63 at ¶ 9) The claw-back provision provides that, upon discovery of unintentional disclosure of such documents, the producing party shall, within five business days, make a written request to the receiving party for the return of the documents and attach a corresponding privilege log. (*Id.*) Within five business days of receipt of such a request, the receiving party (1) must return or destroy the identified documents and (2) if it disagrees with the claim of privilege or immunity, may file a motion to compel production of the documents (and may retain the documents only for purposes of litigating that motion). (*Id.*)

2

## C. Inadvertent Disclosure of the Documents at Issue

During the course of discovery, M&G served Requests for Production of Documents on both INVISTA and Auriga. (D.I. 171, ex. A-1 & A-2) In response, Plaintiffs produced over a million pages of discovery to M&G. (D.I. 191 at 1) In August 2012, following a production of documents by Auriga, Plaintiffs determined that certain of those documents were purportedly protected by the attorney-client privilege or work product doctrine. (*Id.* at 3) On August 15, August 21, and September 21, 2012, Plaintiffs notified M&G that certain documents had been unintentionally produced, requested that M&G comply with the claw-back provision of the Protective Order by destroying those documents, and served privilege logs identifying the inadvertently produced documents. (D.I. 192 at ex. A–C) M&G did not respond to either of the August communications; in response to the September 21 communication, M&G objected to Plaintiffs' claims of privilege and immunity regarding the 70 documents identified by Plaintiffs. (D.I. 191 at 3-4)

In December 2012, after M&G used one of the documents that had been clawed back in August 2012 in connection with the EPO proceeding, Plaintiffs requested confirmation that M&G had destroyed the clawed back documents. (D.I. 192, ex. D) M&G replied that it was challenging Plaintiffs' claims of privilege regarding those documents, and that it had not destroyed the documents; instead, it stated that it had sequestered the documents in accordance with Federal Rule of Civil Procedure 25(b)(5)(B), asserting that it believed that it was permitted to do so, despite the wording of the Protective Order's claw-back provision. (*Id.*)

In a later effort to reduce the number of disputed documents at issue, Plaintiffs withdrew claims of privilege on over 50 documents implicated by their prior claw-back requests, and

3

served revised privilege logs on December 21, 2012. (D.I. 191 at 5; D.I. 192, exs. F, G & H) The parties failed to reach agreement as to the remainder of the clawed-back documents, and on January 9, 2013, the Court held a teleconference with the parties. The Court determined that the claw-back provision of the Protective Order superceded Rule 25(b)(5)(B). (D.I. 349 (hereinafter, "Tr.") at 65-73) Accordingly, the Court ordered M&G to comply with the claw-back provision by returning or destroying the documents at issue, or, alternatively, by moving to compel production of the documents in dispute, within five business days.[1] (Tr. at 72-75) M&G chose the latter course, filing the instant motion in regard to 81 documents on January 16, 2013. (D.I. 170) M&G's motion was fully briefed as of February 14, 2013. (D.I. 204)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 37 applies to motions to compel discovery, providing that "[o]n notice to other parties and all affected persons, a party may move for an order compelling . . . discovery." Fed. R. Civ. P. 37(a)(1). Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." While it is well-settled that the Federal Rules permit broad discovery, a party's right to discovery is not without limits. *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999). One such limit is that courts may not order the production of

---

[1]     INVISTA has preserved its right to file an objection to the Court's January 9, 2013 order, having indicated objection to the portion of the order that permitted M&G to file a motion to compel production of the documents clawed back in August 2012. (D.I. 172; Tr. at 72-75) INVISTA had argued that because M&G did not timely object to INVISTA's claim of privilege as to those documents, M&G forfeited its right to do so. (Tr. at 72-75) The Court disagreed, instead finding that—in light of M&G's claim that its failure to timely object was based on a good-faith understanding of the meaning of the claw-back provision (one that differed from Plaintiffs' understanding)—M&G should have five days to file its motion to compel after the conclusion of the January 9, 2013 teleconference. (*Id.*)

discovery that is protected by an evidentiary privilege. *See, e.g., Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).

Once an objection is raised as to relevancy, a party moving to compel discovery bears the burden of demonstrating the relevance of the requested information. *Inventio AG v. ThyssenKrupp Elevator Am. Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009); *Standard Chlorine of Delaware, Inc. v. Sinibaldi*, 821 F. Supp. 232, 258 (D. Del. 1992). However, when documents otherwise relevant are sought to be protected from disclosure due to the asserted existence of an evidentiary privilege, the party seeking such protection bears the burden of establishing the privilege. *In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012); *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 377 (D. Del. 2010); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 1:CV-09-1685, 2010 WL 4537002, at *1 (M.D. Pa. Nov. 3, 2010). That party also has the burden of establishing that the privilege has not been waived. *S.E.C. v. NIR Grp., LLC*, 283 F.R.D. 127, 132 (E.D.N.Y. 2012); *Kimberly-Clark Worldwide*, 2010 WL 4537002, at *1.

## III. DISCUSSION

M&G now moves the Court to compel disclosure of seven of the 35 documents identified on Auriga's privilege log and 68 of the 103 documents identified on INVISTA's privilege log. (D.I. 171 at 2)[2] With the exception of one document, all of those listed on INVISTA's log are actually Auriga documents, produced by Auriga, and bate-stamped "AURIGA". (D.I. 192, ex. H)

---

[2]     M&G originally challenged 74 documents identified on INVISTA's privilege log, but has since withdrawn its claims for six of those documents (i.e., PL025, PL026, PL027, PL048, PL087, and PL088). (D.I. 204 at 9, 11)

5

In support of its motion, M&G asserts two primary arguments. First, M&G argues that INVISTA does not have standing to assert privilege over Auriga documents. (D.I. 171 at 2-4; D.I. 204 at 2-5) In response, INVISTA contends that it shares a common legal interest with Auriga, and pursuant to the common interest doctrine, it has standing to assert privilege over all such documents. (D.I. 191 at 10) Second, as to the remaining documents (i.e., the documents on Auriga's privilege log and the sole INVISTA document on INVISTA's log), M&G argues that Plaintiffs have failed to satisfy their burden of proving that the documents are privileged because their privilege logs fail to identify attorney participation regarding the entries at issue. (D.I. 171 at 5-8) Plaintiffs respond that a communication may still be privileged even if not addressed to an attorney; they explain that the pertinent communications involved Dr. Geoffrey Scantlebury, a former INVISTA employee, who is currently employed by Auriga and qualifies as a privileged person based on his role as a technical liaison to attorneys.[3] (D.I. 191 at 1-2, 7-9)

After first setting out the law as to the relevant privileges and doctrines, the Court will next address certain legal issues that apply broadly to a number of documents. Lastly, it will then address the specific documents at issue.

## A.     Relevant Privileges and Doctrines at Issue

### 1.     The Attorney-Client Privilege

The attorney-client privilege bestows upon the client the "right to refuse to disclose confidential communications between attorney and client made for the purpose of obtaining legal advice." *Hoffmann-La Roche, Inc. v. Roxane Labs., Inc.*, No. 09-6335 (WJM), 2011 WL

---

[3]     Plaintiffs rely on Declarations by Dr. Scantlebury in support of the majority of their claims asserting the applicability of the attorney-client privilege, the common interest doctrine, and the work product doctrine. (D.I. 192, exs. L & N)

6

1792791, at *4 (D.N.J. May 11, 2011) (internal quotations marks and citation omitted). In

protecting these communications, the privilege "encourage[s] full and frank" information

exchanges within the attorney-client relationship, in order to promote the observation of law and

the administration of justice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981);

*Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991); *Union

Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1046 (D. Del. 1985). Importantly, while

the privilege protects communications between privileged persons, it does not protect the facts

underlying those communications. *Brigham and Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*,

707 F. Supp. 2d 463, 469 (D. Del. 2010) (citing *Upjohn*, 449 U.S. at 395). The privilege is

premised upon recognition by the courts that "the need to permit the attorney to provide sound

legal advice generally outweighs any disadvantage of withholding evidence in a particular case."

*Union Carbide*, 619 F. Supp. at 1046; *accord Westinghouse*, 951 F.2d at 1423. Because the

privilege militates against the general rule promoting full disclosure of information between

parties to a lawsuit, however, courts must construe it narrowly. *Westinghouse*, 951 F.2d at 1423;

*Union Carbide*, 619 F. Supp. at 1046.

The United States Court of Appeals for the Third Circuit has held that for the attorney-

client privilege to protect a communication, "it must be (1) a communication (2) made between

privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance

for the client." *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011) (internal quotation marks

and citations omitted).[4] "'Privileged persons' include the client, the attorney(s), and any of their

---

[4]        This patent infringement action arises under federal law, with the Court's
jurisdiction based on 28 U.S.C. § 1331 and 28 U.S.C. § 1338. (D.I. 7 at ¶ 5) Accordingly,
federal common law applies here to questions of privilege. Fed. R. Evid. 501; *see also Pearson*,

7

agents that help facilitate attorney-client communications or the legal representation." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (citation omitted). The privilege must be asserted on a document-by-document basis, rather than as a single, blanket assertion. *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990).

In line with the narrow construction that it receives, "[t]he privilege protects *only* those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Westinghouse*, 951 F.2d at 1423–24 (internal quotation marks and citation omitted). Generally, a party's voluntary disclosure to a third party of information purportedly protected by the attorney-client privilege destroys the information's confidentiality, thus obviating the privilege. *Id.* at 1424.

## 2. **Work Product Doctrine**

The work product doctrine is a privilege that is distinct from, and broader than, the attorney-client privilege. *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975). The doctrine protects papers "prepared by or on behalf of attorneys in anticipation of litigation."

---

211 F.3d at 66. In patent cases, regional circuit law governs disputes relating to the applicability of the attorney-client privilege and related privileges/doctrines, to the extent that those issues are not unique to patent law. *See, e.g., In re Google Inc.*, 462 F. App'x 975, 977 (Fed. Cir. 2012); *In re Regents of the Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (analyzing application of common interest doctrine in patent case pursuant to the law of the regional circuit); *MPT, Inc. v. Marathon Labels, Inc.*, No. 1:04 CV 2357, 2006 WL 314435, at *2 (N.D. Ohio Feb. 9, 2006) (same). However, when a determination of the applicability of such a privilege implicates a substantive patent law issue, the law of the United States Court of Appeals for the Federal Circuit applies. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803-04 (Fed. Cir. 2000); *Shire Dev. Inc. v. Cadila Healthcare Ltd.*, C.A. No. 10-581-KAJ, 2012 WL 5247315, at *3 (D. Del. June 15, 2012). The parties do not suggest that resolution of the issues at hand turn on whether Third Circuit or Federal Circuit law applies. To the extent that the Court relies explicitly on Federal Circuit law below, it will indicate why that particular issue is one unique to patent law.

*Westinghouse*, 951 F.2d at 1428; *accord WebXchange Inc. v. Dell Inc.*, 264 F.R.D. 123, 128 (D. Del. 2010) (citation omitted); Fed. R. Civ. P. 26(b)(3) (defining work product as "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)"). The policy underlying the doctrine is that if attorneys can prepare their cases without fear that their work product will be used against their clients, this will promote the adversary system. *Westinghouse*, 951 F.2d at 1428.

Attorney work product is not discoverable absent a showing of substantial need, undue hardship, or inability to obtain their equivalent by other means. Fed. R. Civ. P. 26(b)(3); *WebXchange Inc.*, 264 F.R.D. at 128. Even where such a showing is made, Rule 26(b)(3) requires courts to protect from disclosure "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." The party asserting the work product doctrine bears the burden of demonstrating that the documents at issue were prepared by or for counsel in preparation for trial or in anticipation of litigation. *WebXchange Inc.*, 264 F.R.D. at 128.

Like the attorney-client privilege, work product protection can be waived. *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 478 (D. Del. 2012). However, "[b]ecause the work product doctrine serves to protect an attorney's work product from the adversary, a disclosure to a third-party does not necessarily waive the protection of [the] work product, as it does with attorney-client privilege." *Id.* Rather, to waive the work product doctrine, "the disclosure must enable an adversary to gain access to the information." *Id.* (citing *Westinghouse*, 951 F. 2d at 1428).

9

### 3.    The Common Interest Doctrine

The common interest doctrine is an exception to the general rule that voluntary disclosure

to a third party of purportedly privileged information waives the privilege. *Leader Techs.*, 719 F.

Supp. 2d at 376; *Union Carbide*, 619 F. Supp. at 1047.  The doctrine has its roots in the joint-

defense privilege, but has since been expanded to "protect[] all communications shared within a

proper 'community of interest,' whether the context be criminal or civil." *Teleglobe*, 493 F.3d at

364 (internal citations omitted).  Permitting disclosure of such communications to parties sharing

a common legal interest is "consistent with the goal underlying the [attorney-client] privilege

because [this] type of disclosure is sometimes necessary for the client to obtain informed legal

advice." *Westinghouse*, 951 F.2d at 1424.

To prove that the common interest doctrine protects the documents at issue from

discovery, the party asserting the doctrine bears the burden of showing that an underlying

privilege has been established, and that (1) the communications at issue are made by separate

parties in the course of a matter of common legal interest; (2) the communications are designed

to further that common legal interest; and (3) the privilege has not been waived. *MobileMedia*

*Ideas LLC v. Apple Inc.*, 890 F. Supp. 2d 508, 515 (D. Del. 2012); *In re Leslie Controls, Inc.*,

437 B.R. 493, 496 (Bankr. D. Del. 2010); *see also Nidec Corp. v. Victor Co. of Japan*, 249

F.R.D. 575, 578 (N.D. Cal. 2007).  In order for waiver to occur, all members of the common

interest community must consent to the waiver. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 263

F.R.D. 142, 146 (D. Del. 2009); *In re Imperial Corp. of Am.*, 179 F.R.D. 286, 289 (S.D. Cal.

1998); *Killebrew v. City of Greenwood, Miss.*, No. 4:95CV355-B-B, 1997 WL 208140, at *2

(N.D. Miss. Apr. 11, 1997).

While there is a split in authority regarding whether the common interest doctrine protects communications among non-attorneys, the Court has concluded that, in certain circumstances, it can. *Invidi Techs. Corp. v. Visible World, Inc.*, Civil Action No. 11-397-RGA-CJB, D.I. 188, slip op. at 29-31 (D. Del. Mar. 11, 2013). Specifically, the Court has found that in order to invoke the common interest doctrine as to a communication between non-attorneys, a party must establish that the communication reflects one of three circumstances: "'(1) one party is seeking confidential information from the other on behalf of an attorney; (2) one party is relaying confidential information to the other on behalf of an attorney; and (3) the parties are communicating work product that is related to [] litigation.'" *Id*. at slip op. at 31 (quoting *IBJ Whitehall Bank & Trust Co. v. Cory & Assoc.*, No. Civ. A. 97 C 5827, 1999 WL 617842, at *6 (N.D. Ill. Aug. 12, 1999)).

## B.     INVISTA's Standing to Assert Privilege Over Auriga Documents

M&G argues that INVISTA does not have standing to assert privilege over any of the Auriga documents identified on INVISTA's privilege log. (D.I. 171 at 2-4; D.I. 204 at 1)  Some of the challenged Auriga documents on INVISTA's log were created prior to the sale of certain assets by INVISTA to Auriga, and were transferred to Auriga pursuant to the sale (hereinafter, the "pre-sale documents"). (D.I. 171 at 2-4; D.I. 204 at 12)  M&G contends that INVISTA transferred any privileges that it had in the pre-sale documents to Auriga, or, in the alternative, INVISTA waived any privileges that it had in the documents by sending them to Auriga, a third-party. (D.I. 171 at 2-4; D.I. 204 at 3-5)

The remaining Auriga documents on INVISTA's privilege log were created after the sale of assets. (D.I. 171 at 4)  M&G asserts that to the extent these documents are privileged, the

11

privilege belongs to Auriga to assert, not INVISTA, and Auriga has affirmatively withdrawn its claim of privilege over these documents. (*Id.*)

In response to M&G's standing arguments, Plaintiffs assert that a common interest has existed among Plaintiffs during the relevant time periods, and that therefore INVISTA has standing to assert privilege over the Auriga documents identified on its log pursuant to the common interest doctrine. (D.I. 191 at 10) Plaintiffs argue that these documents are protected by either the attorney-client privilege or work product doctrine. (*Id.* at 13)

### 1. Sale of Assets by INVISTA to Auriga

In order to analyze the standing issue, the Court must first consider the relationship between Plaintiffs and the facts pertaining to the sale of certain assets by INVISTA to Auriga. On November 11, 2010, pursuant to a Purchase and Sale Agreement ("PSA"), Auriga purchased certain assets from INVISTA, including a manufacturing facility in Spartanburg, South Carolina, all tangible property therein, and an exclusive license to an intellectual property portfolio. ███

Accordingly, once the PSA closed, on March 1, 2011, many INVISTA employees became Auriga employees, including Dr. Scantlebury. (D.I. 191 at 6)

INVISTA's transfer to Auriga of an exclusive license to certain intellectual property is governed by an Intellectual Property License Agreement ("IPLA"). (*Id.*; D.I. 192, ex. J)

12



The IPLA addresses INVISTA's and Auriga's rights and obligations in the event of infringement of the licensed rights. (D.I. 192, ex. J at ¶ 3.2)

Finally, the transfer agreements set out INVISTA's and Auriga's privilege-related rights and obligations.

On April 25, 2012, shortly before Auriga was joined in the instant action as a co-Plaintiff, INVISTA and Auriga entered into a "Common Interest Agreement." (D.I. 192, ex. K)

13



(*Id.*)

> **2. Whether INVISTA Transferred All Privileges in the Pre-Sale Documents to Auriga, Such that INVISTA Cannot Assert that the Common Interest Doctrine Protects the Documents From Disclosure**

With respect to the pre-sale documents, M&G argues that INVISTA "transferred" any

right it had to assert the protections of, *inter alia*, the common interest doctrine, pointing

exclusively to the language of Section 5.13(d) of the PSA. (D.I. 171 at 2-3) M&G argues that

INVISTA lacks standing to assert this doctrine, █████████████████████████████████

██████████████████████████████████████████████████████████████████████████████.

█████████████████████████████████████████████████.

In reviewing the text of the PSA, the Court cannot agree with M&G's position that

██████████████████████████ INVISTA transferred its ability to assert that the common

interest doctrine protects the documents from disclosure. (D.I. 204 at 4) █████████████████

██████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ██ ████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ██ ███ ██

██████████████████████████████████████████████████████████████████████████████

14

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████

This language, on its own and in context with the other portions of Section 5.13(d), does not "clearly" indicate to the Court that INVISTA meant to transfer or give up its right, in a circumstance such as this, to invoke the common interest doctrine as to documents transferred pursuant to the asset sale. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ ██ ████ Indeed, it is telling that in their joint answering brief, both Plaintiffs take the position that Section 5.13(d)'s language does not prohibit INVISTA from asserting the common interest doctrine here.

Thus, the Court cannot find that pursuant to Section 5.13(d), INVISTA clearly transferred (or otherwise waived) its right to assert the common interest doctrine in this case. As a result, although Auriga does not assert the doctrine's applicability here, INVISTA may still do so (assuming the doctrine in fact applies to certain communications), since where the elements of the common interest doctrine are satisfied, either party involved in the communications can assert the doctrine to protect those communications from disclosure. *See, e.g., Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 273 (N.D. Ill. 2005) (stating that where the common interest doctrine applies to documents, those documents "will of course be privileged in the controversy of either or both of the clients with the outside world") (internal quotation marks and citations omitted).

### 3.    Whether INVISTA Otherwise Waived Applicable Privileges in the Documents at Issue, and Whether the Common Interest Doctrine Can Apply to Such Documents

The Court must next confront M&G's argument that INVISTA "waived the [attorney-client privilege] related to the transferred documents" when it sent the pre-sale documents to Auriga pursuant to the asset sale.[5] (D.I. 171 at 3)  Generally, disclosure of privileged information to a third-party waives the privilege. *Westinghouse*, 951 F.2d at 1424.  However, as noted above, Plaintiffs argue that they had and have a common legal interest in enforcing the patents-in-suit against infringers and in upholding the validity and enforceability of those patents.  They thus assert that the pre-sale documents retained the protection of the attorney-client privilege pursuant to the common interest doctrine, despite their transfer. (D.I. 191 at 7, 10-13)

Plaintiffs also assert that the other post-sale documents at issue involve communications between INVISTA and Auriga, made to further the parties' common interest. (*Id.*)  As a result, they argue that INVISTA may also invoke the common interest doctrine to protect these documents from disclosure under the law. (*Id.*)[6]

For the reasons set out below, the Court finds that Plaintiffs indeed share a common legal interest in maintaining strong and enforceable patents-in-suit—an interest that began from at

---

[5]    INVISTA asserted that the Court need not consider waiver because M&G "neither argued nor asserted that there has been any waiver of the asserted attorney-client privilege . . . as to the documents." (D.I. 191 at 9 n.9)  In fact, however, M&G did argue waiver. (*See* D.I. 171 at 3; D.I. 204 at 5 n.1)

[6]    It is unclear why both parties suggest that *Delaware* law applies to the common interest doctrine analysis. (*See* D.I. 191 at 7 ("[U]nder Delaware law, INVISTA and Auriga had a common interest in enforcing and upholding the validity of the patents in suit . . . ."); D.I. 204 at 2 ("[U]nder Delaware law, this is insufficient to establish a common interest exception.")) As explained above, *supra* note 4, in this case, federal common law applies to the asserted privileges.

16

least the time that the parties entered into the asset sale agreement and that continues through to the present day.

The leading modern case describing the common interest doctrine, *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146 (D.S.C. 1974), explained that the "key consideration is that the nature of the interest be *identical, not similar*, and be legal, not solely commercial." *Id.* at 1172 (emphasis added). A number of cases from this District have recited the *Duplan* standard, including the requirement that the shared legal interest be identical, in analyzing the common interest doctrine. *See, e.g.*, *Invidi*, slip op. at 13 & n.10 (citing cases); *Leader Techs.*, 719 F. Supp. 2d at 376; *Corning Inc. v. SRU Biosys., LLC*, 223 F.R.D. 189, 190 (D. Del. 2004); *Constar Int'l, Inc. v. Cont'l Pet Techs., Inc.*, No. Civ. A. 99-234-JJF, 2003 WL 22769044, at *1 (D. Del. Nov. 19, 2003); *Union Carbide*, 619 F. Supp. at 1047.[7]

The *legal—*not *solely commercial—*nature of the parties' interests is another key to the doctrine's applicability. *Duplan*, 397 F. Supp. at 1172. Notably, the parties' interests do not have to be solely legal in nature. Rather, as this Court has noted, "the privilege may apply

---

[7]     Courts are not uniform in their characterization of just how similar the legal interests of the parties must be in order for the common interest doctrine to apply. *Teleglobe*, 493 F.3d at 365 (noting that the Restatement (Third) of the Law Governing Lawyers took a "more flexible approach than *Duplan*", emphasizing that the respective parties' interests "need not be entirely congruent", and for purposes of the opinion, noting only that "members of the community of interest must share at least a substantially similar legal interest") (internal quotation marks omitted). Some cases from this District have cited this "at least a substantially similar legal interest" language in articulating what must be established for the doctrine to apply. *See, e.g.*, *MobileMedia*, 890 F. Supp. 2d at 515; *Robert Bosch LLC*, 263 F.R.D. at 146; *see also, e.g.*, *CIF Licensing, LLC v. Agere Sys. LLC*, No. 07-170-LPS, 2012 WL 6085368, at *8 (D. Del. Dec. 3, 2012) (recognizing that some cases from this District cite to the strict *Duplan* standard while others utilize the "at least a substantially similar legal interest" language in *Teleglobe*). The Court will assume that the *Duplan* standard applies here and need not affirmatively decide the issue, as its decision below is not affected by whether an "identical" legal interest or "at least substantially similar" legal interest is required for application of the common interest doctrine.

17

although the communications include discussions of various business matters as long as they are infused with legal concerns." *MobileMedia*, 890 F. Supp. 2d at 515 (internal quotation marks and citation omitted). The parties do not have to be involved in "[a]ctual litigation" or an "ongoing lawsuit" for their interests to be legal; "anticipated" litigation is sufficient. *Id.*

Contrary to M&G's argument that the license agreement between Plaintiffs is "insufficient" to warrant the protection of the common interest doctrine in any respect, (D.I. 204 at 2), courts have indeed found that licensors and exclusive licensees of patents share a common, identical legal interest sufficient to invoke the doctrine. *See In re Regents of Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (concluding that the common interest doctrine applied to protect certain documents from disclosure where the "legal interest between Lilly and UC was substantially identical because of the potentially and ultimately exclusive nature of the Lilly-UC license agreement" and therefore "[b]oth parties had the same interest in obtaining strong and enforceable patents"); *Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 539 (N.D. Ill. 2000) (finding a sufficient common legal interest between parties where they had entered into an exclusive licensing agreement that gave licensor primary responsibility for legal defense of the licensed patents, and licensee responsibility to provide reasonable assistance, "which makes their interests essentially identical"). Relatedly, courts examining whether two parties share a common legal interest in certain patents consider whether both parties would be affected in the same way by litigation regarding the patents. *See, e.g.*, *Research Inst. for Med. and Chemistry, Inc. v. Wisconsin Alumni Research Found.*, 114 F.R.D. 672, 677-78 (W.D. Wis. 1987) (rejecting applicability of common interest doctrine where the relevant agreement granted "only a non-exclusive license" to licensees that "[u]nlike an exclusive licensee [did not obtain] monopoly

18

power to exclude competition within the stipulated area" and thus had an interest "quite different" from patent owner; court also noted that none of the licensees were themselves party to any suit or other proceeding regarding the validity of any relevant patents, "nor were they otherwise related so as to show an identical legal interest in the outcome of any litigation").

Here, the license agreement between INVISTA and Auriga granted Auriga a bundle of rights in the patents-in-suit, but retained substantial rights for INVISTA, including ownership of the patents and the right to commence patent litigation. (D.I. 192, ex. J) From at least the date the parties entered into the PSA and ILPA, they held what can be described as identical interests in ensuring that the patents-in-suit were "strong and enforceable[,]" *In re Regents*, 101 F.3d at 1390, as any threat to the patents' validity or enforceability in that time would cause the potential for the same kind of legal harm to INVISTA (as the patents' owner) and Auriga (as the patents's exclusive licensee). In addition, for parties to share a common legal interest, "anticipated litigation" is sufficient. *MobileMedia*, 890 F. Supp. 2d at 515. Clearly, INVISTA and Auriga anticipated future litigation regarding the patents from the time of the execution of the PSA and ILPA, as demonstrated by the fact that an entire section of the ILPA is devoted to the parties' rights and obligations in the event of "Infringement of Licensed Rights." (D.I. 192, ex. J at ¶ 3.2) While INVISTA maintains the right to "commence, prosecute, and fully control" infringement actions, the IPLA obligates Auriga to cooperate with INVISTA in any such actions, including, if necessary, joining the action as a party plaintiff (as it has done here). (*Id.*) Therefore, as these documents reflect, from at least the beginning of the parties' contractual relationship, INVISTA and Auriga shared a common legal interest in maintaining valid and strong patents-in-suit.

The nature of that common legal interest becomes even clearer to see when examining the

19

parties' roles as co-Plaintiffs in the instant lawsuit. Indeed, as Plaintiffs point out, (D.I. 191 at 11), M&G itself has recognized Auriga as a necessary party to this action based on its status as the holder of an exclusive license in the patents-in-suit, (D.I. 192, ex. P at ¶ 7). It can be anticipated that co-plaintiffs (or co-defendants) in a lawsuit involving the same patents will share information, and this, of course, is at the heart of the common interest doctrine; it allows "[c]ommunications between clients and attorneys allied in a common legal cause [to] remain protected because it is reasonable to expect that parties pursuing common legal interests intended resultant disclosures to be insulated from exposure beyond the confines of the group." *Leader Techs.*, 719 F. Supp. 2d at 376 (internal quotation marks and citation omitted); *see also Union Carbide*, 619 F. Supp. at 1047 (in describing the common interest doctrine, stating that "[t]hird party communications . . . retain a protective shield if the parties have a common legal interest, such as where they are co-defendants or are involved in or anticipate joint litigation") (citation omitted).

Accordingly, the Court finds that Plaintiffs have demonstrated that a common legal interest in maintaining strong and enforceable patents-in-suit existed between them at all relevant times regarding the documents at issue. If Plaintiffs meet their burden to prove the doctrine's applicability to these documents, INVISTA may assert the doctrine to protect against disclosure to M&G.

## C. Dr. Scantlebury's Role and Relationship with the Parties

Many of the documents at issue in some way involve Dr. Scantlebury, a non-attorney who currently works for Auriga and does consulting work for INVISTA. Plaintiffs argue that Dr. Scantlebury qualifies as a "privileged person" and therefore communications involving him can

20

be protected. (D.I. 191 at 14-15)

Prior to the sale of assets by INVISTA to Auriga, Dr. Scantlebury worked, under the direction of attorneys, for INVISTA and its predecessors as a "liaison between the legal and research and development groups." (D.I. 191 at 8; *accord* D.I. 192, ex. L at ¶¶ 3-6) In this position, Dr. Scantlebury interfaced between inventors and attorneys and provided technical guidance to attorneys. (*Id.*) When the PSA closed, on March 1, 2011, Dr. Scantlebury began employment with Auriga, where he continues to work today as the Director of Technology Management and Intellectual Property Manager. (D.I. 192, ex. L at ¶ 1) At Auriga, a company that does not presently employ in-house attorneys, Dr. Scantlebury acts as the liaison between Auriga and outside counsel regarding intellectual property legal issues. (*Id.*)

As noted above, Dr. Scantlebury has maintained a relationship with INVISTA, acting as a consultant for the company in light of his experience with the preparation and prosecution of the patents-in-suit and their European counterpart patents. (D.I. 191 at 9; D.I. 192, ex. O) Dr. Scantlebury's consulting work for INVISTA entails "providing information, data, advice and other support relating to" European patent opposition proceedings, patent nullification matters, patent prosecution matters, and marketing and branding. (D.I. 192, ex. O at ¶ 1) Dr. Scantlebury describes his role as a consultant as similar "to that of a non-attorney expert who is retained by a party to provide technical advice and to conduct testing for attorneys in patent litigation and prosecution matters." (*Id.*, ex. L at ¶ 2) Pursuant to his consulting duties, Dr. Scantlebury has conducted testing and analysis for the EPO proceeding regarding INVISTA's EP '630 Patent and has provided assistance to INVISTA attorneys prosecuting U.S. patent applications. (D.I. 191 at 9)

21

The Court finds M&G's key argument regarding many of the challenged

documents—that they cannot be privileged because they did not directly involve an attorney—to

be incomplete.[8] (*See, e.g.,* D.I. 171 at 6 ("Auriga has not established that any of these documents

are communications between it and legal counsel. . . . [N]o attorneys are listed in these entries as

being anyway involved with the documents.")) It is well-settled that "a document does not even

need to be addressed to or from an attorney to be privileged—privileged communications may be

shared by non-attorney employees 'in order to relay information requested by attorneys,' and so

that the corporation is 'properly informed of legal advice and [may] act appropriately.'" *Shire*

*Dev. Inc. v. Cadila Healthcare Ltd.*, C.A. No. 10-581-KAJ, 2012 WL 5247315, at \*3 (D. Del.

June 15, 2012) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D.

Pa. 2005)); *see also Teleglobe*, 493 F.3d at 359 (defining "privileged persons" as including

agents of the client or attorney "that help facilitate attorney-client communications or the legal

representation"); *High Point SARL v. Sprint Nextel Corp.*, Civil Action No. 09-2269-CM-DJW,

2012 WL 234024, at \*14 (D. Kan. Jan. 25, 2012) ("Avaya is not prohibited from claiming

attorney-client privilege for documents that were authored or created by non-attorney employees

or consultants of Avaya's IP Law Group.").

---

[8]        In its opening brief, M&G also argued that most of the post-sale documents at
issue were "created by Auriga, on Auriga systems, and for Auriga's business" and that INVISTA
could not assert privilege as to documents "created by an entirely separate and unrelated
company." (D.I. 171 at 4) Plaintiffs responded by noting that Dr. Scantlebury served as an
INVISTA consultant after the asset sale, and that his involvement in the communications at issue
related to his role as an INVISTA employee taking direction from INVISTA counsel. (D.I. 191
at 13-15) In light of this response, M&G appears to have withdrawn its argument in this regard;
in its reply brief, M&G went on to assume for the sake of argument that Dr. Scantlebury
"qualifies as a 'privileged person' due to his consulting agreement with Invista[,]" but contended
that because the common interest doctrine did not apply here, once Dr. Scantlebury
communicated with Auriga employees, any privilege was lost. (D.I. 204 at 6-7)

Here, given his past and present roles as liaison between Plaintiff corporations and counsel, and his role as a consultant to INVISTA, Dr. Scantlebury can qualify as a privileged person, and therefore the communications in which he is involved *may* be privileged (depending upon the further circumstances of each document, to be analyzed below). *See High Point SARL*, 2012 WL 234024, at *14 (finding communications prepared or transmitted by non-attorney employees who "were members of the IP Law Group, were involved in the evaluation of the patents-in-suit and litigation opportunities, and were working at the direction of Avaya attorneys" to be protected from disclosure by the attorney-client privilege).

Furthermore, Plaintiffs have asserted that many of the Scantlebury-related documents are protected by the work product doctrine (rather than the attorney-client privilege). "It is the settled law of this Circuit that work product protection extends to documents prepared by non-attorneys acting at an attorney's request." *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F. Supp. 1429, 1444 (D. Del. 1989).[9] Therefore, despite Dr. Scantlebury's

---

[9]     M&G cites to *Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367 (N.D. Ill. 1972) for the proposition that "the absence of an attorney's participation in a document's creation gives rise to a conclusive presumption that the document was created in the ordinary course of business and not in anticipation of litigation." (D.I. 171 at 6)  However, this statement glosses over a key portion of what the *Thomas Organ* Court actually held:

> [T]he Court . . . conclude[s] that *any* report or statement made by or to a party's agent (other than to an attorney acting in the role of counsellor), *which has not been requested by nor prepared for an attorney nor which otherwise reflects the employment of an attorney's legal expertise* must be conclusively presumed to have been made in the ordinary course of business and thus not within the purview of the [work product doctrine].

*Thomas Organ*, 54 F.R.D. at 372 (emphasis added).  Thus, the holding of *Thomas Organ* is in line with this Court's statement in *Willemijn Houdstermaatschaapij BV*—that non-attorneys may be involved in preparing work product, so long as they are acting under the direction of an attorney.

status as a non-attorney, communications in which he is involved may also be work product-protected, depending on the individual circumstances of each document.

### D. Documents at Issue[10]

With the above guidelines in mind, the Court now turns to the documents at issue.

#### 1. Documents that INVISTA Asserts Are Protected by the Attorney-Client Privilege and Common Interest Doctrine

##### a. PL009, PL057 and PL058

These documents contain e-mail correspondence dated March 11, 2011 and March 16, 2011 in which Craig Sterner, Chief Patent Counsel for INVISTA, furnished an INVISTA employee, Torsten Schmidt, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (D.I.

191 at 15-16) Mr. Schmidt forwarded the letter to Dr. Scantlebury and Klaus Schweitzer,

INVISTA's counsel in the EPO proceeding, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 16) In the final e-mail of the thread, Dr. Scantlebury ▮▮▮▮▮.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 16) Plaintiffs assert, pursuant to

a Declaration by Dr. Scantlebury, only that the communications "reflect[] legal advice" sought from INVISTA attorneys and "reflect a shared legal interest between INVISTA and Auriga involving potential patent litigation between M&G and INVISTA's customers." (D.I. 192, ex. L

---

[10]     The documents at issue can be found at D.I. 171, ex. E ("Challenged Documents").

24

at ¶ 10)[11]

The difficulty with INVISTA's privilege claims regarding these documents is that even assuming these e-mails are otherwise protected by the attorney-client privilege, INVISTA has not met its burden in demonstrating the applicability of the common interest doctrine to the documents. The Court has found that INVISTA and Auriga indeed share a common legal interest in maintaining strong, valid and enforceable patents covered by the IPLA (an argument that Plaintiffs did make repeatedly in their answering brief). However, Plaintiffs have not sufficiently asserted how, under the law, they have had an identical (or at least substantially similar) legal interest in "potential patent litigation between M&G and INVISTA's customers" regarding M&G's patents. As indicated above, it was their burden to do so—to make that claim and support it with sufficient facts, argument and/or legal authority. *MobileMedia Ideas*, 890 F. Supp. 2d at 515.

Therefore, the Court cannot conclude that INVISTA has met its burden to establish the applicability of the common interest doctrine to these documents. Accordingly, the Court GRANTS M&G's motion with respect to PL009, PL057 and PL058.

   **b. PL105**

---

[11] Other than in this one citation to Dr. Scantlebury's Declaration, Plaintiffs do not otherwise reference this type of "common interest" in their answering brief. Instead, throughout their brief, Plaintiffs otherwise reference a different type of asserted common legal interest. (*See, e.g.*, D.I. 191 at 1 ("INVISTA and Auriga have a common interest in enforcing and upholding the validity of the patents in suit and their foreign counterparts"); *id*. at 7 (defining their common legal interest as being "in the prosecution and enforcement of the '159, '216, and '930 patents"); *id*. at 11 n.10 ("Here, it is undisputed that INVISTA and Auriga have identical legal interests in enforcing and upholding the validity of the patents in suit."); *id*. at 11 ("Here, there is no dispute that INVISTA and Auriga possess a common interest in enforcing the [patents-in-suit] against infringers like M&G and upholding the patents' validity."))

This pre-sale document was created on March 3, 2003

by Dr. Leo Liu, one of the inventors of the patents-in-

suit. (D.I. 191 at 16-17) This document was sent to Dr. Scantlebury (when he worked at KoSa,

INVISTA's predecessor) along with other documents comprising the                    (D.I.

192, ex. L at ¶ 27) Dr. Scantlebury then used this document to assist the IP legal department in

(*Id.*)

M&G argues that this pre-sale document should be disclosed because it was transferred to

Auriga as part of the asset sale, and therefore INVISTA either transferred its privilege to Auriga,

or waived its privilege in the document upon transfer to Auriga. (D.I. 204 at 12) As explained

above, however, the Court has not found that INVISTA transferred its right to assert the common

interest doctrine regarding pre-sale documents. Nor did it waive its right to do so by providing

the document to Auriga, so long as the communication is subject to the doctrine.

In a previous discovery dispute between the parties, the Court ruled that INVISTA

invention records, which were sent to the IP Legal department, logged into a database, and then

forwarded to Dr. Scantlebury to discuss with a patent attorney, were protected by the attorney-

client privilege. (D.I. 141 at 25-35 (citing *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800,

805 (Fed. Cir. 2000)) (holding that "an invention record constitutes a privileged communication,

as long as it is provided to an attorney for the purpose of securing primarily legal opinion, or

legal services, or assistance in a legal proceeding") (internal quotation marks and citations

omitted))[12] When Dr. Scantlebury worked at KoSA, the protocol regarding such documents was

---

[12]     The Federal Circuit has held that the issue of whether an invention record is
protected by the attorney-client privilege clearly implicates substantive patent law, as such a
record relates to an invention submitted for consideration for possible patent protection, and

the same, (D.I. 192, ex. L at ¶ 27), and this document is similarly protected by the privilege.

This privileged document, created by an inventor ████████████████████████

████████████████████████████████ was clearly transferred by INVISTA to

Auriga to further their common legal interest in maintaining a strong, valid and enforceable '159

Patent ████████████████████████████████████████████████████

████ There is no indication that the privilege has been waived as to this document; in order

for this to be accomplished, all members of the common interest community must consent to the

waiver. *In re Imperial Corp.*, 179 F.R.D. at 289; *Killebrew*, 1997 WL 208140, at *2. And the

communication, although itself created by a non-attorney, was transferred from INVISTA to

Auriga as part of the asset sale, (D.I. 204 at 12) and therefore was clearly shared with Auriga at

the behest of attorneys from both sides who were involved in the deal. (*See* D.I. 192, ex. J at ¶

2.9(a) (for a period of one year following the effective date of the IPLA, requiring, upon Auriga's

request, INVISTA to "make available to [Auriga], documents and materials embodying the

Licensed Rights [including the patent applications that issued as the patents-in-suit]"))

Accordingly, the Court DENIES M&G's motion with respect to PL105.

### c. **PL107, PL108 and PL109**

These pre-sale documents, transferred to Auriga pursuant to the asset sale, contain e-mail

communications regarding ████████████████████████████████████████

████████████████ (D.I. 191 at 17) ████████████████████ (*see, e.g.*, D.I. 257

at 4). PL107 is an e-mail containing ████████████████████████████████

████████████████████████████████████████████████████████

---

therefore is unique to patent law. *In re Spalding*, 203 F.3d at 804.

████████████████████████████████████████ PL108 contains e-mails that appear

to be from then-INVISTA employees concerning ███████████████████████████ ██ █

████████████████████ PL109 contains an e-mail from an attorney at Keller & Heckman

providing legal advice to then-INVISTA employees, as well as e-mails from Auriga employees

following the asset sale regarding that advice. ██ ████████████████████

    As with other pre-sale documents, M&G argues that these communications should be

disclosed because they were transferred to Auriga as part of the asset sale.  (D.I. 204 at 12-13)

As explained above, however, INVISTA did not transfer its right to assert the common interest

doctrine regarding such documents.  Nor did it waive its privilege in the documents, so long as

the communications further Plaintiffs' common interest.

    On that latter score, Plaintiffs' answering brief does not say much about how the

communications further that common legal interest.  However, in light of the fact that the

communications relate to legal advice about the product covered by the patents-in-suit, and that

they were transferred as part of the asset sale that included a grant of rights in the patents-in-suit,

there is just enough information in the record for the Court to infer that they sufficiently relate to

Plaintiffs' common legal interest in the patents-in-suit articulated above.  There is no indication

that the privilege has been waived as to these documents.  Although M&G calls out PL109 as

containing ████████████████████████████████████████████ (D.I. 204 at

12), the e-mails ██████████████████████████████████ and are therefore protected,

(D.I. 191 at 17-18).  The Court thus DENIES M&G's motion with respect to PL107, PL108 and

PL109.

        **d.**    **PL118**

This pre-sale document contains e-mails between Dr. Scantlebury and a then-INVISTA

employee ███████████████████████████████████████████████████████

█████████████████████████████████████████ ██ ██ Auriga has withdrawn

its claim of privilege for this document, (D.I. 192, ex. G at 3), while INVISTA maintains that it is

protected by the common interest doctrine and attorney-client privilege (*id.* at ex. H). As

explained above, INVISTA did not transfer its right to assert the common interest doctrine

regarding pre-sale documents. Nor did it waive its right to do so by providing this document to

Auriga, so long as the communication properly invokes the common interest doctrine.

As both Plaintiffs and M&G point out, however, Auriga did not acquire any rights to the

EP '630 Patent or other European counterpart patents pursuant to the asset sale. (D.I. 191 at 6

n.7; D.I. 204 at 3, 7) ██████████████████████████████████████████████

████████████████████████ As previously noted, Plaintiffs repeatedly defined the nature

of their common legal interest as being "in the prosecution and enforcement of the '159, '216, and

'930 patents." (D.I. 191 at 7; *see also id.* at 11 n.10 ("Here, it is undisputed that INVISTA and

Auriga have identical legal interests in enforcing and upholding the validity of *the patents in

suit*.") (emphasis added)) Indeed, the Common Interest Agreement between Plaintiffs states ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ The

Introduction section of Plaintiff's answering brief does once assert that "INVISTA and Auriga

have a common interest in enforcing and upholding the validity of the patents in suit *and their

foreign counterparts*." (D.I. 191 at 1 (emphasis added)) However, Plaintiffs do not further

elaborate as to the nature of Auriga's common legal interest in a foreign patent or proceedings relating to that patent—a patent in which Auriga holds no rights.

On this record, the Court cannot find the common interest doctrine applicable to this document. As the doctrine operates to exclude communications from discovery, courts must narrowly and cautiously apply it. *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 252 F.R.D. 163, 171 (S.D.N.Y. 2008) (citation omitted); *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 402 (E.D. Tex. 2003) (citation omitted). There may be an argument that an exclusive licensor and a licensee to a patent have an identical (or at least substantially similar) legal interest in the soundness of foreign counterpart to that patent in which the licensee holds no rights, or that the content of particular communications relating to a foreign counterpart patent can be said to further Plaintiffs' common interest in the patents-in-suit. However, such an argument would need to be fully set out by Plaintiffs. *Cf. In re Regents*, 101 F.3d at 1390 (finding that exclusive licensee had common interest in U.S. patents and foreign counterpart patents, but where license extended to both types of patents); *Johnson Matthey, Inc. v. Research Corp.*, No. 01CIV.8115MBMFM, 2002 WL 1728566, at \*6 (S.D.N.Y. July 24, 2002) (concluding that plaintiff did not have common legal interest in outcome of foreign proceeding in which its legal rights were not at stake). It was Plaintiffs' burden to make that argument to the Court along with factual and legal support. Here, the Court cannot find that Plaintiffs' single conclusory statement in the Introduction of their brief—without any supporting argument, case law, or facts proffered in support of the statement—is sufficient to meet this burden.

In light of this, the Court GRANTS M&G's motion with respect to PL118.

## 2. Documents that Auriga Asserts Are Protected by the Attorney-Client Privilege

### a. PL139, PL177, PL178, PL180 and PL181

These documents, five versions of one e-mail thread, make up five of the seven

challenged documents on Auriga's privilege log. (*See* D.I. 192, ex. G) Plaintiffs contend that ███

███████████████ of the March 27, 2012 e-mail are the only portion of these

communications over which privilege is asserted. (D.I. 192, ex. N at ¶¶ 7-8) Dr. Scantlebury

affirms that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████ he states that he thereafter passed it along to Frank Embs, the author of the e-mail (who in

turn, in the various documents, forwards it on to other Auriga employees). (*Id.* at ¶ 7)

Although there are no attorneys listed on the e-mail chain, M&G's contention that the e-

mails "do not appear to contain any reference to counsel or legal advice," (D.I. 204 at 13), is still

puzzling, as on their █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ And, as discussed above, a communication that relays legal advice may

still be privileged, even if it does not directly include an attorney. *See Shire Dev. Inc.*, 2012 WL

5247315, at *3. In light of Dr. Scantlebury's Declaration, and the content of the bullet points, the

Court finds that those portions of the March 27, 2012 e-mail from Mr. Embs contained in these

e-mail threads are protected by the attorney-client privilege. Therefore, it DENIES M&G's

motion with respect to PL139, PL177, PL178, PL180 and PL181.

### b. PL189 and PL190

These documents were █████████████████████████████████████████ .

████████████████████████████████████████████████████████ (D.I. 191 at

17; D.I. 192, ex. N. at ¶ 9)  The documents were drafted by certain inventors of the patents-in-

suit, and then sent to Shell Huang, a co-inventor and manager, and ultimately to Dr. Scantlebury.

Dr. Scantlebury then used these documents ███████████████████████████████████

███████████████████████████████████  (D.I. 192, ex. N. at ¶ 9)  PL189 appears

to be the same document as PL105, which is discussed above.

M&G argues that these documents must be disclosed for two reasons.  First, M&G argues

that ████████████████████████████████████████████████████████████████████████

███████ and that such information is not privileged.  (D.I. 204 at 13)  Second, M&G asserts that

these documents were transferred to Auriga as part of the asset sale, and that if the privileges

associated with these documents were not transferred, then the privileges were waived.  (*Id.* at

14)

In support of its first argument, M&G cites to *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp.

136 (D. Del. 1977) for the proposition that "[t]he attorney-client privilege does not protect

technical information such as the results of research, tests, and experiments communicated to the

attorney, not calling for a legal opinion or interpretation, but meant primarily for aid in

completing a patent application."  (D.I. 204 at 13-14 (quoting *Hercules*, 434 F. Supp. at 147))

However, M&G fails to consider the holding by the Federal Circuit in *In re Spalding Sports

Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000), relating to invention records that contain

technical information.[13]  The *In re Spalding* Court held that invention records that were

submitted by the inventors to the corporation's legal department, for the purpose of obtaining

---

[13]     As explained above, *supra* note 12, this is an issue unique to patent law.  *In re
Spalding*, 203 F.3d at 804.

legal advice or assistance in a legal proceeding, were protected by the attorney-client privilege, despite their inclusion of technical information, "because requests for legal advice on patentability or for legal services in preparing a patent application necessarily require the evaluation of technical information[.]" *Id.* at 805-06; *see also Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. C09-355 VRW, 2010 WL 727220, at *2 (N.D. Cal. Mar. 1, 2010) (noting that *In re Spalding* "dispelled the view then held by many courts that purely technical information communicated to an attorney was not privileged"). Even if invention records do not expressly request legal advice, they are still privileged so long as "the overall tenor of the document indicates that it is a request for legal advice or services." *In re Spalding*, 203 F.3d at 806. Because these documents were sent to Dr. Scantlebury                        , and were then utilized by him

                         the Court finds that they fall into the scope of protected records established by *In re Spalding*.

As to the second argument raised by M&G, the Court can clearly find that the transfer of these documents furthered Plaintiffs' common legal interest in maintaining valid and enforceable patents-in-suit, in that they contain information regarding

                     The Court has found that there is no indication that the privilege has been waived. And, as noted above, the context of the submission of this document to Auriga indicates that it was done at the behest of attorneys for both INVISTA and Auriga, subsequent to the asset sale. The Court thus DENIES M&G's motion with respect to PL189 and PL190.

### 3. Documents that INVISTA Asserts Are Protected by the Work Product and Common Interest Doctrines

a.   **PL006, PL015, PL019, PL023, PL024, PL031-37, PL040, PL043, PL045, PL051, PL053, PL121-124, PL126-128, PL132, PL134, PL135, PL137, PL145, PL147, PL157, PL158, PL160, PL161, PL163, PL165, PL172 and PL173**

These documents contain communications between Dr. Scantlebury and Auriga

employees and ███████████████████████████████████████████████████████████.

███████████████████████████████████████████████████████████████████████████

███████████████████████████████ ██ ██████████  Although Auriga has withdrawn its claim

of privilege for these documents, (D.I. 192, ex. G at 3), INVISTA maintains that they are

protected by the common interest and work product doctrines (*id.* at ex. H).

However, for the same reasons as set out in Section III.D.1.d above, Plaintiffs have failed

to satisfy their burden of proving applicability of the common interest doctrine to documents

shared with Auriga employees ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████  Therefore, the Court GRANTS M&G's motion with respect to PL006, PL015,

PL019, PL023, PL024, PL031-37, PL040, PL043, PL045, PL051, PL053, PL121-124, PL126-

128, PL132, PL134, PL135, PL137, PL145, PL147, PL157, PL158, PL160, PL161, PL163,

PL165, PL172 and PL173.[14]

---

[14]   The Court briefly addresses another of M&G's arguments as to certain of these documents—that because the documents and INVISTA's privilege log does not identify an associated attorney, the documents cannot be protected from disclosure. (D.I. 171 at 7-8) As discussed above, however, the work product doctrine protects communications prepared by non-attorneys in anticipation of litigation. Fed. R. Civ. P. 26(b)(3)(A); *see also In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 666 (3d Cir. 2003) (noting that "the work product doctrine extends to materials compiled by a non-attorney, who, as the 'agent' of a party or a party's attorney, assists the attorney in trial preparation") (internal quotation marks and citation omitted). Dr. Scantlebury's Declaration makes clear that these communications ████████████████████ █████████████████████████████████████████████████████████████████████████

### b. PL012, PL013, PL016 and PL084

These documents contain e-mail communications between Dr. Scantlebury and Auriga employees stemming from a request by INVISTA's in-house counsel ███████████████

███████████████ (D.I. 191 at 19; D.I. 192, ex. L at ¶ 11)  Despite M&G's argument to the contrary (D.I. 204 at 8), as explained above, Plaintiffs have a common legal interest in the patents-in-suit, and this communication furthers their common legal interest in maintaining valid and enforceable patents in this litigation.

There is no indication that the privilege has been waived as to these documents.  And the communications, although between non-attorneys, were prepared on behalf of an attorney for INVISTA.  Accordingly, the Court DENIES M&G's motion with respect to PL012, PL013, PL016 and PL084.

### c. PL146, PL148, PL166 and PL174

These documents ████████████████████████████

███████████████ ▌▌ Because Plaintiffs, for the reasons set out in Section III.D.1.d, have failed to satisfy their burden of proving applicability of the common interest doctrine to documents ████████████████████ the Court GRANTS M&G's motion with respect to PL146, PL148, PL166 and PL174.[15]



████████████████ Accordingly, the Court does not give weight to this particular argument.

[15]    M&G also argues that these documents are not privileged ████████████

### d. PL044

This pre-sale document was created by a then-INVISTA employee, at the request of

INVISTA's legal department, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (D.I. 191

at 20; D.I. 192, ex. L at ¶ 19) However, because the nature of patent prosecution involves a non-

adversarial, *ex parte* proceeding, work performed at the request of an attorney to prosecute a

patent application does not, as a "blanket rule," fall within the scope of the work product

doctrine. *Hercules*, 434 F. Supp. at 151-52. Instead, such work product must be examined on a

case-by-case basis, to determine whether the record reflects concerns more relevant to future

litigation than the ongoing prosecution. *Id.*; *see also Accenture Global Servs. GMBH v.

Guidewire Software, Inc.*, Civ. No. 07-826-SLR, 2009 WL 2253577, at *1 (D. Del. July 29,

2009); *In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 184-85 (D.N.J. 2003) (noting that

"documents that are routinely generated in connection with a patent application are not protected

by the work product doctrine simply because an issued patent may give rise to an infringement

action" but that "documents pertaining to the patent application process which were also

prepared because of actual or anticipated litigation may be protected by the work product

doctrine") (internal quotation marks and citations omitted).

Because this document was prepared for use in prosecuting the '159 Patent, and there is

no indication (or argument) put forward as to why its preparation can be particularly said to have

related to the anticipation of litigation, the Court finds INVISTA has not met its burden to

demonstrate that the work product doctrine is applicable to this document. *See Info-Hold, Inc., v.*

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Court does not give weight to

this particular argument.

*Trusonic, Inc.*, No.1:06cv543, 2008 WL 2949399, at \*4 (S.D. Ohio July 30, 2008). The Court thus GRANTS M&G's motion with respect to PL044.

### e. PL059 and PL130

These documents contain communications between Dr. Scantlebury and an Auriga

employee ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

▮▮▮▮▮▮▮▮▮ (D.I. 191 at 21; D.I. 192, ex. L at ¶ 20) INVISTA contends that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (D.I. 191 at 21 n.15) M&G's reply does not

address this point, (*see* D.I. 204 at 10), and because M&G has not made the relevance of these

documents clear, the Court DENIES M&G's motion with respect to PL059 and PL130.

### f. PL061, PL143, PL162 and PL171

These documents contain communications between Auriga employees with a copy to Dr.

Scantlebury relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Because, for the reasons set

forth in Section III.D.1.d, Plaintiffs have failed to satisfy their burden of establishing a common

interest regarding such documents ▮▮▮▮▮▮▮▮▮▮, the Court GRANTS M&G's

motion with respect to PL061, PL143, PL162 and PL171.

### g. PL065, PL066, PL093-PL095 and PL100

PL065, PL066, PL094, PL095 and PL100 were created by Dr. Scantlebury and contain



PL093 was created by an INVISTA employee and relates to ▮▮▮▮▮▮▮▮▮▮▮.



▮▮▮▮▮▮▮▮▮▮ Because, for the reasons set forth in Section III.D.1.d, Plaintiffs

have failed to satisfy their burden of establishing a common interest regarding documents ▓

▓ the Court GRANTS M&G's motion with respect to PL065, PL066,

PL093-PL095 and PL100.

### h. PL119

This document, created by Dr. Scantlebury, ▓

▓ (D.I. 191 at 21-22; D.I. 192, ex. L at ¶ 29) INVISTA contends that

▓ (D.I. 192, ex. L at ¶ 29) M&G's

reply does not address this point, (*see* D.I. 204 at 13), and because M&G has not made the

relevance of this document clear, the Court DENIES M&G's motion with respect to PL119.

### E. M&G's Request for Reimbursement of its Attorney's Fees and Expenses

M&G has requested, pursuant to Federal Rule of Civil Procedure 37(a)(5),

reimbursement of its attorney's fees and expenses in connection with this motion. However,

M&G's motion is only granted-in-part, and even in those instances, the decision was less about

the lack of clear merit behind Plaintiffs' argument and more about its failure to carry its burden

to put forward that argument. In such a circumstance, the Court declines to find that

reimbursement is warranted. *See Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust*, Civil

Action No. 09-CV-0663 (JCJ), 2011 WL 1636949, at \*6 n.5 (D. Del. Apr. 29, 2011) (denying

similar request where motion was granted-in-part and denied-in-part); *A&B Ingredients, Inc. v.

Hartford Fire Ins. Co.*, Civil Action No. 08-6264 (SRC) (MAS), 2010 WL 335616, at \*8 (D.N.J.

Jan. 29, 2010) (same).

### IV. CONCLUSION

For the reasons outlined above, it is hereby ORDERED that M&G's motion to compel

the requested discovery is GRANTED-IN-PART.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **July 3, 2013** for review by the Court. The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: June 25, 2013

Christopher A. Burke

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE